# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

Bubble Pony, Inc., a Minnesota
Corporation and Patrick J. Glynn,

Case No.: 15-cv-00601-DSD-FLN

        Plaintiffs,

v.

Facepunch Studios Ltd,
Facepunch Limited, Facepunch
Group Limited, and Garry Newman,

        Defendants.

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR:

1.  BREACH OF CONTRACT;
2.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AGAINST FACEPUNCH;
3.  INTENTIONAL INFLICTION OF MENTAL AND EMOTIONAL DISTRESS;
4.  NEGLIGENCE OF FACEPUNCH, NEGLIGENCE OF OFFICERS, NEGLIGENCE OF SUPERVISION AND NEGLIGENT RETENTION;
5.  INTERFERENCE WITH ECONOMIC ADVANTAGE AND CONTRACT;
6.  FRAUD BY FACEPUNCH;
7.  FRAUD BY GARRY NEWMAN;
8.  BREACH OF FIDUCIARY DUTY BY FACEPUNCH;
9.  BREACH OF FIDUCIARY DUTY BY GARRY NEWMAN;
10  UNJUST ENRICHMENT AND IMPOSITION OF A CONSTRUCTIVE TRUST AGAINST FACEPUNCH;
11. FRAUDULENT CONCEALMENT/OMISSION BY FACEPUNCH;
12. FRAUDULENT CONCEALMENT/OMISSION BY GARRY NEWMAN;
13. EQUITABLE ESTOPPEL;
14. PROMISSORY ESTOPPEL;
15. ACCOUNTING;
16. DECLARATORY JUDGMENT;
17. WASTE;
18. MISAPPROPRIATION OF IDEAS;
19. DEFAMATION
20. DISCRIMINATION IN VIOLATION OF MINN. STAT. §363A.11

21.   *IN THE ALTERNATIVE,* DISCRIMINATION IN VIOLATION OF MINN. STAT. §363A.08*;*
22.   *IN THE ALTERNATIVE,* VIOLATIONS OF MINN. STAT. §181.101 AND §181.171;
23.   *IN THE ALTERNATIVE,* VIOLATIONS OF MINN. STAT. §181.03, AND §181.171,

---

## NATURE OF THE CASE

This is an action brought by Bubble Pony, Inc., a Minnesota corporation (hereinafter known as "Bubble Pony") and Patrick J. Glynn, a United States citizen and resident of the state of Minnesota (hereafter "Glynn"), collectively known herein after as "Plaintiffs" against Facepunch Studios Ltd, a company incorporated in England, (hereinafter known as "Facepunch Studios") Facepunch Limited, a company incorporated in England, Facepunch Group Limited, a company incorporated in England (hereafter collectively known as "Facepunch") and Garry Newman (hereafter known as "Newman").

In 2010, Patrick J. Glynn, a computer game developer (also called programmer), entered into a contract to work with Facepunch Studios Ltd as an independent contractor to develop internet games.  Plaintiff relied upon the statements and representations made by the majority owner of Facepunch Studios Ltd, Garry Newman.  In 2012 and 2013, Plaintiff Glynn developed an internet survival game called RUST with employees of Facepunch Studios Ltd which became a huge success.  Plaintiff Glynn authored more than 75% of the source code for RUST.  His work was critical to the success of the game.  The contract between the parties required that Plaintiff Glynn be paid 60% of "all the profits" generated by the games developed by Plaintiff Glynn with Facepunch Studios Ltd.  The Defendants breached their promise to pay Plaintiff Glynn (and the corporation he created to receive some of the payments, Bubble Pony Inc.) 60% of all the profits generated by

RUST.  The effects of Defendants' extraterritorial behavior adversely affected commerce and harmed a United States citizen, the Plaintiff Patrick Glynn and Plaintiff Bubble Pony, Inc., a United States corporation incorporated in the state of Minnesota.  The Defendants also engaged in numerous other acts of wrongful conduct during the course of the relationship and following the termination of Plaintiff Glynn's work with Facepunch, including but not limited to defrauding Plaintiff Glynn, subjecting him to a hostile work environment, defaming Plaintiff Glynn and his work.  Garry Newman and Facepunch not only attempted to "steal" profits generated by RUST, they destroyed the value of RUST while attempting to replace it with a new "experimental" game developed by Garry Newman and employees of Facepunch which is "virtually unplayable."  As a result, Plaintiff Glynn has been deprived of the actual profits received by Facepunch, and he has been deprived of the profits that would have been earned by the sale of the game but for the tortious and bad faith activities of the Defendants.

## JURISDICTION

1.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332, [Diversity of Citizenship], 15 U.S.C. §§78j(b), 78t(a) and 78aa, United States Copyright Act 17 U.S.C. §101, *et seq.,* 28 U.S.C. §2201 [the Federal Declaratory Judgment Act] and 28 U.S.C. §1338, statutory authority and the pendent jurisdiction of this Court. The matter in controversy exceeds, exclusive of interest, $75,000.00.

2.      The Court has jurisdiction over claims arising under Minnesota state law pursuant to its pendent jurisdiction and 28 U.S.C. §1367(a).  The claims arising under

Minnesota state law and the claims arising under federal law arise from the same case or controversy, and they have a common nucleus of operative fact.

VENUE

3.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(b)(1)-(2).  Plaintiff Glynn resides in the State of Minnesota and Plaintiff Bubble Pony, Inc., is a Minnesota corporation located in the State of Minnesota with its principal place of business located in Minnesota.  A substantial part of the wrongs alleged herein were committed within Ramsey County, Minnesota, which is within the District of Minnesota.

PERSONAL JURISDICTION

4.     Defendants have transacted business in Minnesota and had extensive contacts with Minnesota regarding Plaintiff's contract, payment, and work for Facepunch. From November 1, 2010 until May 30, 2014, Plaintiff worked full-time on projects with Facepunch.  He worked at his home in Minnesota creating software code to be used in various games that he was developing with Facepunch.  In about May or June 2012, Plaintiff began working on a new game that ultimately became RUST.  All of the work performed by Plaintiff in connection with the game RUST occurred in Minnesota.  All work done by Plaintiff on RUST and every invoice from the Plaintiff to the Defendant was in Minnesota.  Plaintiff put wording on the invoices as instructed by the Defendant's agent. The Plaintiff was living in the state of Minnesota when he started to create, develop, and extensively enhance the RUST game.  All of the monies paid to Plaintiff Glynn by Facepunch were wired to his bank account in Minnesota.  Plaintiff received hundreds of communications from the Defendants in Minnesota regarding his work on the RUST

4

project and regarding other matters.  At various times during Plaintiff's work on the RUST project he would have many communications a day with Garry Newman and other members of Facepunch working on the project.  The RUST game was sold in Minnesota and was purchased by more than a half a dozen persons.

5.     Individuals at Facepunch inquired and suggested that Plaintiff set up a corporation to receive payments relating to the substantial profits being generated by the RUST game that Plaintiff developed.  As a result, Plaintiff created Bubble Pony, Inc., a corporation located in Minnesota, which received payments from Facepunch for profits generated by RUST for the work performed by Plaintiff in Minnesota.

6.     Facepunch purchased software for RUST, and other games from companies located in the United States, including Unity, the company that sold the game engine used in connection with RUST, along with Plugins purchased for use in engine from Invert Game Studios, LLC, of Jacksonville, Florida and Six Times Nothing, LLC, of Denver, Colorado.  RUST was initially sold on a website hosted by Amazon, an American company. Plaintiff is informed and believes that Facepunch also licensed the online gaming store Steam, operated by Valve Corporation based in Seattle, Washington and Humble Bundle in San Francisco, California, to sell RUST in exchange for royalty payments to Facepunch. Further, it appears Defendants have been doing business with another U.S. company, WildBit, LLC, for their Beanstalk service.  Plaintiff is further informed and believes that Facepunch sold RUST to more than a million persons through Steam and Humble Bundle, the majority of who live in the United States.

7.      Defendant Garry Newman has travelled to the United States to gaming conferences in Nevada and in Washington to gain knowledge for use in the marketing of the RUST game.  As set forth more fully below, Facepunch and Garry Newman engaged in numerous acts which were intended to harm Plaintiff, knowing that the harm would occur in Minnesota where Plaintiff resided.

8.      The court has personal jurisdiction over the Defendants pursuant to the Minnesota Long Arm Statute [Minn. Stat. §543.19], and Federal Rule of Procedure Rule 4(k) (2) (a).

THE PARTIES

PLAINTIFFS

BUBBLE PONY, INC.

9.      Bubble Pony, Inc., is a Minnesota corporation formed by the Plaintiff Patrick J. Glynn on March 26, 2014 (hereinafter known as "Bubble Pony").  Plaintiff Glynn assigned his right to receive payments on the contract with Facepunch Studios to Bubble Pony.  Bubble Pony was the recipient of wired payments by Facepunch Studios for profits from RUST.

PATRICK J. GLYNN

10.     Plaintiff Patrick J. Glynn is a United States citizen and a resident of the State of Minnesota, County of Washington (hereinafter known as "Glynn").  He is a natural person.  Plaintiff is a game developer.  He transacts business within the state of Minnesota. Plaintiff was an adult at all times herein with a learning disability and Attention Deficit Hyperactivity Disorder (ADHD) (also known as Attention Deficit Disorder (ADD)) who

6

had not graduated from high school. Plaintiff has to take a prescription to treat his illness. Defendants are aware of his condition and have falsely made remarks accusing Plaintiff of having Asperger's syndrome.[1]

11. In September 2010, Plaintiff was working on a project in New Mexico, where he was temporarily staying, as a computer programmer working on various computer games. He was domiciled in Minnesota, kept the majority of his personal property in Minnesota, maintained a living presence in Minnesota and had a valid Minnesota driver's license at the time he first had contact with Defendants. Shortly after first dealing with Defendants he notified them that he was moving back to Minnesota. Hereinafter, Plaintiff Bubble Pony and Plaintiff Glynn shall be known collectively as "Plaintiffs".

DEFENDANTS

FACEPUNCH STUDIOS LTD, FACEPUNCH LIMITED AND FACEPUNCH GROUP LIMITED

12. Defendant Facepunch Studios Ltd, (hereinafter "Facepunch Studios"), is an English company located in Walsall, England, incorporated in England on March 17, 2009 by Garry Newman and Craig Gwilt. Defendant Facepunch Limited, (hereinafter "Facepunch Limited") is an English company located in Walsall, England, incorporated in

---

[1] "Asperger syndrome (AS) is an autism spectrum disorder (ASD), one of a distinct group of complex neurodevelopment disorders characterized by social impairment, communication difficulties, and restrictive, repetitive, and stereotyped patterns of behavior. …The severity of communication and behavioral deficits, and the degree of disability, is variable in those affected by ASD. Some individuals with ASD are severely disabled and require very substantial support for basic activities of daily living. Asperger syndrome is considered by many to be the mildest form of ASD and is synonymous with the most highly functioning individuals with ASD." Source: http://www.ninds.nih.gov/disorders/asperger/detail_asperger.htm

England on October 8, 2014 by Garry Newman and Craig Gwilt.  Facepunch Group Limited (hereinafter "Facepunch Group") is an English company located in Walsall, England, incorporated in England on December 9, 2014 by Garry Newman and Craig Gwilt. Defendant Facepunch Studios, Defendant Facepunch Limited and Defendant Facepunch Group are hereinafter known collectively as "Facepunch" or "Defendants."  Plaintiffs are informed and believe and thereon allege that after a reasonable opportunity for further investigation and discovery of information that is in the Defendants exclusive possession, it will be shown that Facepunch Company Limited and Facepunch Group Limited are successor corporations to Facepunch Studios Ltd with respect to certain rights, duties, obligations, development, sales, marketing, income and profits from RUST.  Defendant Newman has stated on the Internet that the profits from RUST are being used to fund new projects, and it is reasonable that the new Facepunch companies have been created in relation to such projects.

13.    These three companies are hereinafter collectively referred to as "Facepunch," transact business within the State of Minnesota.  They committed acts that injured Plaintiff in Minnesota.  Minnesota has a substantial interest in providing a forum.

GARRY NEWMAN

14.    Defendant Garry Newman is a citizen of and resides in England (hereinafter known as "Newman").  Newman is the majority owner of Defendant Facepunch Studios Ltd, Defendant Facepunch Limited and Defendant Facepunch Group Limited.  Hereinafter defendants Facepunch and Newman shall be known collectively as "Defendants".

8

Defendant Newman has transacted business in Minnesota and damaged Plaintiffs in Minnesota.  Minnesota has a substantial interest in providing a forum.

RIGHT TO EQUITABLE RELIEF

15.     Plaintiff has no plain, adequate, or complete remedy at law to redress all the wrongs alleged herein, and this suit for declaratory and injunctive relief is his only means of securing adequate compliance.

FACTS

FACEPUNCH STUDIOS ENTERS INTO A CONTRACT TO HAVE
PLAINTIFF DEVELOP GAMES IN EXCHANGE FOR
SIXTY PERCENT OF THE PROFITS DERIVED FROM THE GAMES

16.     Plaintiff entered into a contract with Facepunch evidenced by writings between the parties, which required Facepunch Studios Ltd to pay Plaintiff 60% of the profits from games that he developed.

17.     On September 28, 2010, Patrick Glynn sent an e-mail to Garry Newman, hereinafter referred to as Defendant, inquiring about working with the team at Facepunch Studios Ltd.  On September 28, 2010 – Garry Newman sent an e-mail responding:

> "Helk speaks highly of you, and to be honest, that's enough for me.  Your email is impressive though, you seem like just the kind of guy we need.
>
> What I'm basically looking for is someone that will get involved with the engine.  Adding features, restructuring old features, fixing bugs, making tools etc. I'm looking for someone that will do this for 8 hours a day without getting bored. You seem to be that kind of person.

I want to eventually be in a position where you'd be making games for Facepunch Studios, which we'd sell on Steam, or the Apple Appstore, or whatever but once that game makes what we've paid you so far back, you'd get something like a 60% cut of all the profits (probably more, that's kind of TBD). So we'd kind of be investing in you, kind of.

Does that sound like the kind of situation you'd like to be in?"

18.     Plaintiff responded and said that he liked the structure, that it would be nice to work with a team, and that he hoped they could work out what he needed to be paid for living expenses.

19.     Newman then offered to pay $1,900 a month toward living expenses, which would increase $100 every month until it reached $3,000 a month.  Plaintiff agreed, although the amount was far less than Plaintiff would normally be paid.  The Plaintiff only accepted because it was agreed he would receive 60% of the profits from the games and potentially more.  The agreement of the parties was never changed or modified in any way. This agreement was in full effect during the entire time Plaintiff worked on the development of the computer game RUST with Facepunch.  The term "all the profits" was understood by the parties to include all types of income generated by the game, including profits resulting from any later versions of the game.  This includes all profits generated by the "experimental version" of the RUST game.

20.     Plaintiff started work for the Defendants on October 11, 2010.  At that time Plaintiff was an experienced game creator who normally worked for a percentage of the profits, but had not completed enough education to qualify for a high school diploma.

10

While skilled in computer gaming creations and other related matters he has a learning disability and does not have a background dealing with business or legal matters. Plaintiff was twenty-three years old, unschooled in dealing with copyright claims and understood that Defendants were going to be investing in him, which included protecting his interests. Plaintiff was induced to agreeing to work with Defendants by Garry Newman's representations and believed the Defendants would be investing in him. He trusted and relied upon the Defendants to act in a proper manner and keep all of their representations, which included his getting 60% of the profits and Defendants continuing to invest in him, which would include looking after his interests. Plaintiff did not sign any documents, which discuss copyright interests in the games he was to produce.

21.     Plaintiff, before working with Defendants, was accustomed to receiving a percentage of the profits and not paid by the hour. Facepunch knew Plaintiff was only interested in working for a percentage of the profits.

### PLAINTIFF IS HIRED AS AN INDEPENDENT CONTRACTOR TO DEVELOP GAMES WITH FACEPUNCH STUDIOS

22.     In 2010, Plaintiff Glynn was hired as an independent contractor by Facepunch Studios Ltd and was treated as such at all times.

23.     Plaintiff was never an employee of Facepunch. Facepunch did not treat Plaintiff as an employee in any way. Facepunch did not identify Plaintiff as an employee. Facepunch did not give Plaintiff any documents indicating that he was an employee, including but not limited to W2 forms, tax withholding documents, workers compensation benefits, unemployment benefits, medical insurance or pension benefits.

24.     In 2014, Craig Gwilt, an owner of Facepunch Studios, inquired and suggested that Plaintiff set up a corporation to receive payments relating to the substantial profits being generated by the RUST game that Plaintiff developed.  As a result, Plaintiff created Bubble Pony Inc., a corporation located in Minnesota.  The payments from Facepunch for profits generated by RUST were electronically wired into the Bubble Pony's business account.

25.     There were messages from Facepunch that referred to the payments of the profits of RUST as a bonus, although Plaintiff understood them to be payment towards his 60% of the profits.  Defendant's agent used the word "bonus" loosely.  For example, on November 29, 2013 a Director of Defendant communicated to Plaintiff, "when you get time send me another invoice if you can say something like salary $3,000 and RUST bonus $19,912.80.  The wording "something like" reflects that the wording of "bonus" was not precise.  Facepunch was used to using the label "bonus," for employees and it simply used the same word to loosely describe Plaintiff share of the profits.  Plaintiff was not an employee, but rather, he was an independent contractor who was entitled to 60% of the profits generated by the game.   Defendants out of habit referred to payments loosely as a bonus, even though the payment of profits from the sales of RUST to Plaintiff were clearly required by the contract.

PLAINTIFF RETAINS ALL RIGHTS TO HIS COPYRIGHTS
IN THE GAMES HE DEVELOPED WITH FACEPUNCH STUDIOS

26.   Plaintiff worked in the United States.  The source code and artwork he created for RUST was fixed on his computer in the United States at the time of its creation and his copyright in the work was created in the United States.

27.   Plaintiff was not asked to and did not execute, a "work for hire" agreement giving up his ownership rights in the games that he worked on with Facepunch.  Plaintiff was not asked to and did not execute any document relinquishing his ownership of any copyright in the work that he produced with Facepunch.  There was no agreement of any kind that Plaintiff Glynn would transfer his copyright ownership interest to Facepunch.  It is commonly understood in the game development community that if there is no written "work for hire" agreement signed by a game designer who is not an employee of the developer, the designer is considered to be a joint author of the game and entitled to a share of the profits.

PLAINTIFF DEVELOPED THE RUST GAME AS A
JOINT AUTHOR WITH FACEPUNCH STUDIOS

28.   Beginning in November 2010, Plaintiff worked full-time on projects with Facepunch. In 2011, Plaintiff created software source code and artwork for a game he jointly authored with Facepunch employees called "Cash4Kills," which was never released. In or about June 2012 Plaintiff began working on the development of a new game called RUST.  Plaintiff used the pre-existing source code that he had developed for the Cash4Kills project as a basis for the RUST game

29.    RUST is a role-playing survival game where hundreds of people may play on tens of thousands of servers.  People can pay one of the server hosting companies to provide them with their own server for RUST, which they are able to administer.  In the game, a player is represented by his or her avatar, which provides a visual representation in the game of the player's actions/interactions with the game world.  RUST allows the player to choose more intrusive means of survival as well as going beyond just surviving. The player controls their avatar to represent the player within the game to carry out the objectives of the game.  The objective in RUST is to survive by acquiring what is needed to survive, such as food, shelter, and warmth by any means deemed necessary by the player.

30.    A new player acquires what he or she needs to survive such as food, clothing, shelter, and weapons to protect from other players, the elements, and wildlife.  Players can operate individually or can create alliances with other players in an effort to provide greater success in hunting for food, raiding other player's resources and building structures, for common defense and/or common offense.  Originally, a player's avatar was "spawned" into the game as an adult male with military clothing.  Garry Newman demanded that a player's avatar be "spawned" into the game as a naked anatomically correct male avatar.

31.    Plaintiff worked on RUST on average six (6) days a week for at least ten (10) hours a day.  Plaintiff was the primary developer of the source code for the original game "RUST".  Plaintiff produced more than 75% of the source code for the game.  Plaintiff also contributed more than a dozen artwork files used in the game.  The game would not function, and would not look and feel the same except for the contributions of the Plaintiff. Plaintiff's contributions were original, creative and substantial.  The only persons who

contributed to the development of the game RUST were Plaintiff and the employees of Facepunch. Plaintiff and Facepunch are co-authors and co-owners of the game.

32.     Plaintiff collaborated with the employees of Facepunch in developing RUST, including, Maurino Berry, who contributed some source code for RUST. Plaintiff and employees of Facepunch each contributed independently copyrightable content with the intention that their work would be merged together into inseparable or interdependent parts of a unitary whole, the original RUST computer game.  It is common practice in the video game industry for games to be developed by teams of individuals working together to develop a single game.  Plaintiff and Maurino Berry have been identified by Facepunch as the developers of RUST.  The original computer game RUST is a "Joint Work" within the meaning of Section 101 of the Copyright Act [17 U.S.C. § 101]. And Plaintiff Patrick Glynn was a co-author of the work and a joint owner of the copyrights with Defendant Facepunch, holding an indivisible 50% interest therein.

33.     Game developers such as Plaintiff, will often use game engines to provide the underpinnings of a game and then in the process of game development, will create the actions, the look, the rules and the way the game will operate.  Plaintiff had to do a lot of work to surpass limitations set in place by the engine.  Plaintiff created substantial aspects of the game adding many unique and noteworthy features and developing new code to significantly improve, enhance and exceed limitations set by the features provided by the Unity3D game engine with the understanding that he was to receive 60% of the profits of the game and any derivatives thereof.  Given the potential for RUST, as represented by Defendants, Plaintiff was led to believe he would earn more than the 60% of the profits on

the RUST game.  He understood that he was to permanently have rights to the RUST game and any derivative products or services pursuant to the representation of the Defendants and his agreement with Defendants.  Plaintiff worked for approximately one year to make the original RUST game operational.  There was a limited release of the game for testing on or about June 17, 2013.  The test only lasted a few days, but it resulted in a favorable review in an online post.

34.    Once the Plaintiff was able to make his creation of RUST operational to be played, his work on the game became even more intensified than before and included creation and upgrading to game features and adjustments to the game to make it operate effectively for the gaming communities[2] as well as responding to suggestions and/or concerns voiced by members of the gaming community.  The work done on the RUST game consumed the vast majority of the Plaintiff's waking hours.

THE RUST GAME WAS SUBSTANTIALLY CREATED AND DEVELOPED BY PLAINTIFF

35.    Plaintiff created unique contributions to the RUST game.

36.    The Sleeper feature.  Sleepers are what remain in the world of the game when a player logs off the server while his avatar (person) is still alive in the game.

---

[2] "Gaming communities" refers to the population of people who play massive on-line computer games.  Such players have very high levels of expectation with respect to a game's performance, including but not limited to, the game concept, its appearance, the action of the game, the available options a player can exercise within the game, the speed at which the game plays, how quickly the game and game features load, how responsive the game is, how responsive the game's programmers are to gaming community concerns, the up-time of the servers hosting the game (if a game is unstable it can adversely affect server performance as well as overall game performance), and communication between the player's computer and the game servers as information is exchanged within the context of the game.

37. Plaintiff created code designed to provide any number of combinations of armor such as head (helmet), torso (vest), leg (pants), and feet (boots) armor pieces. In addition to armoring players who are actively playing the game, the Armor feature also takes up the task of armoring sleepers as well as ragdolls (dead bodies).

38. Plaintiff also created environmental graphics such as the Sky and Water. The Sky feature was designed to provide a more realistic day into night into day environment within the game and changes in lighting. Plaintiff created the "Aura."

39. Plaintiff also created the Water graphic and related elements used in the game that worked hand-in-hand with the Sky graphics to give the playing environment a more realistic look.

40. Plaintiff wrote the code to make the grass graphics work. Further Glynn enhanced the game by piecing resources into small data bundles which could be cached by the web browser used to play the game.

41. Plaintiff configured the particle code used to make flames and burning ashes from torches. Facepunch used the same particle code, with only minor edits, to design campfires.

42. Plaintiff also configured the particle code used to create blood spatter shown when player avatars and animals are shot or wounded in the game.

43. In addition, Plaintiff created code for previewing object placement along with graphical shaders. This preview code helps players to see exactly where an item can be put in the game if the player decides to use the item. The indicators are easily visible at

all times of the day and also turn red if a player attempts to put an item in a location where it cannot be placed.

44.     Initially RUST used a third party User Interface (UI).  That UI did not work well enough to be able to play the game.  Plaintiff rewrote the majority of the UI, targeting the slowest parts for rewrite to make the game work correctly.

45.     Plaintiff created code that was able to accommodate a greater number of players and to more efficiently handle the most frequent tasks to be performed on the servers as the game is being played.  By reducing power required to run a single server it allows for more players per server, more servers per single computer and less cost to add additional servers.

46.     Plaintiff created the contextual interaction code used in RUST to interact with items placed in the game world.

47.     Plaintiff created a First Person Shooter (FPS) "view model"[3] code that does away with the standard game features for FPS games where the player is not actively aiming the held item at what he or she is targeting and is required to use "crosshairs" in the middle of the screen to provide aiming.  The FPS view model code Plaintiff created for RUST does away with the unrealistic frames of reference found in standard FPS games, such as crosshairs and allows the virtual operator to adjust the held item to properly orient and position the item naturally as if in the real world.

_____

[3] View model refers to the 3D representation of weapon or item displayed in front of the player's first person view.

48.     Plaintiff created code for rendering view models that allowed for completely separate near and far planes while still being rendered on the same camera as the rest of the game world.  Plaintiff also created features that allowed for placement of items in front and behind the view model such as gun sights, silencers and muzzle flashes.

49.     There are limitations inherent in the Unity game engine and networking middleware with respect to the number of objects that can be placed inside the game server. Plaintiff developed code that created a more flexible user environment than would otherwise have been unavailable to players.

50.     An "exploit" is when a player figures out a way to cheat the game (and other players) by doing something that the game developers did not intend for the player to be able to do.  One such "exploit" corrected by Plaintiff in the original RUST, was the Duplicate Items Exploit.  Plaintiff corrected multiple others in the Original game.

51.     Plaintiff created code for network culling that reduced the cost of hosting games and reduced lag time[4] thus improving the player's enjoyment of the game and the game environment.

52.     Plaintiff consistently and successfully implemented game design elements involving interpolation, prediction and messaging that allowed for smooth game play. These three elements are critical to successful games.  If these three elements are not successfully implemented even the best game concept will fail because user experience will be unsatisfactory.

---

[4] Lag time is the time between the player's action and/or reaction to something in the game and the response to the player's action from the server and/or other players.

RUST BECOMES A HUGE SUCCESS GENERATING OVER
$46 MILLION DOLLARS IN SALES IN LESS THAN TWO YEARS

53.     Beginning on or about August 30, 2013, the original RUST game was initially sold over the internet directly to the users on a "Dutch auction" sale, in which the number of units available for sale each day sold out. The game was a success within the gaming community, but the access to the game in this form was limited.  In December 2013, the original RUST game was offered for sale on Steam for "early access."[5] Facepunch sold over one million copies within the first three months of its release on Steam. In a little more than one year, RUST has sold over 2 million copies and it has generated over Forty-six million dollars in sales.[6]  Currently, RUST can only be played on Steam, but there is at least one other store which sells RUST.  Humble Bundle based in San Francisco, California allows customers to purchase RUST on the Humble Bundle store, which results in the customer being able to redeem the game in Steam.

---

[5] It is common for game developers to release an early version of a game to people to begin playing before all of the elements of the game are completely worked out.  This allows the game developer to get live feedback from the gaming community playing the game about how the game works in the real world gaming environment, which can be significantly different from the environment in which the game is developed.  For instance, how the game plays on different computers and servers can vary greatly.  In order to make a game playable over the broadest possible range of conditions, developers use feedback from real world players about what the game players like, don't like, what might be causing glitches in the smooth operation of the game and other potential issues.  Developers then use the feedback from the gaming communities to de-bug the game if necessary, enhance existing features, add features, and otherwise make the game more enjoyable to play.

[6]  The sales numbers for RUST are published on the RUST website owned and operated by Facepunch.  The Sales income has been posted by Facepunch on the internet.

54.     However, in or around March, 2014, Plaintiff Glynn was asked by Facepunch to stop his work on the development of the RUST code in order to write down a detailed description of the operation of the code.

55.     Facepunch was hiring additional people to work on RUST, and Plaintiff assumed that the purpose of preparing the description was to provide a reference guide to explain the operation of the code to the new hires.

56.     Plaintiff Glynn spent over one month compiling the reference material describing his work.

57.     After completing the reference document, Plaintiff Glynn continued working with Facepunch employees on projects relating to development of the original RUST game. Plaintiff continued work on RUST through the end of May 2014.

58.     Glynn and Facepunch employees continually developed the original RUST game and made substantial changes between August 2013 and April 2014.  There were, however, no substantive changes made to the original RUST Game after April, 2014.

59.     On January 22, 2015, Plaintiff Patrick Glynn registered the RUST computer program and artwork for the June 17, 2013 publication as a Joint Work with Facepunch Studios Ltd, Registration Number TX 7-959-723.  Plaintiff has filed an application for the registration of the RUST computer program and artwork for the August 30, 2013 version as well.

60.     The standard for software development has several life cycles starting in "Pre-Alpha", then "Alpha", to "Beta" and finally in Release form, "Gold".  Defendants released the RUST game referring to it as an "early access game" in an "Alpha" form.

Plaintiff reasonably anticipated working and improving on the game indefinitely to make the necessary changes to make it a "finished product" and thereafter he would still frequently make significant updates.

61.     Defendants induced Plaintiff to continue to work on the game by representing to him that he would become rich.  In November of 2013 Craig Gwilt, a Director of Facepunch, communicated to Plaintiff, "… u will need to buy a shovel as well to shovel all of the money around…" in sending the message to Plaintiff how much money he was going to make.

62.     Later Craig Gwilt sent another message inducing Plaintiff to work on RUST because of all the money he was going to make.  Mr. Gwilt said, "…your next RUST bonus is gonna be paid on 1st March and I wondered if you have put any thought into the tax you will be paying as it will likely be a quite sizeable payment."  Plaintiff did not discuss with people that he was getting 60% of the profits or correct the loose use of the word bonus because he thought his share of the profits was to be kept confidential and that if others knew they might be jealous and or resentful as the topic was frequently discussed by the employees of the studio.

FACEPUNCH STUDIOS BREACHES THE CONTRACT
WITH PLAINTIFF GLYNN AND FAILS TO PAY
PLAINTIFF GLYNN THE MONIES THAT IT OWES TO HIM

63.     Pursuant to the contract, Facepunch owes Plaintiff 60% of the profits derived from the RUST game.  In or about October 2013, Plaintiff received an initial payment of $19,912.80 as his share of profits from the first month of sales in September of 2013.  On or about March 1, 2014, Plaintiff was paid an additional $405,138.24 from the sales of

RUST.  Plaintiff understood that this payment was for the sales of RUST in the fourth quarter of 2013.  Plaintiff believed at the time that the payment represented his 60% percent of the profits under the contract.

64.    On or about May 30th, 2014, Plaintiff was informed that he would receive $277,151.22 from the sales of RUST, and he subsequently received a payment in this amount. Plaintiff understood that the May payment of $277,151.22 was for the sales of RUST in the first quarter of 2014.

65.    On May 30th, 2014, Plaintiff was told by a message that he would no longer be working with Facepunch as of that day.  Plaintiff never received any documents explaining the total sales and expenses related to the profits generated by the sales from RUST.  However, the May figure provided to Plaintiff clearly demonstrated that Facepunch had not paid him all of the monies owed pursuant to the contract.

66.    The amounts paid in March and in May were not consistent with the contract requiring Facepunch to pay 60% of the profits from the sales of RUST to Plaintiff.  The sales of RUST in the first quarter of 2014 were around four times the amount of sales in the fourth quarter of 2013.  Notwithstanding the substantial increase in sales, the amount paid to Plaintiff by Facepunch for the first quarter of 2014 was far less than the amount paid to Plaintiff for the last quarter of 2013.   Plaintiff is informed and believes that further investigation of information that is in the Defendants' exclusive control will establish that Plaintiff has not been paid 60% of the profits generated from the sales of RUST (in excess of Forty-six Million Dollars ($46,000,000.00) and that Defendants owe Plaintiff millions of dollars.

67.     In addition to failing to pay Plaintiff 60% of the profits through May of 2014, Facepunch has failed to pay Plaintiff any monies for sales occurring after May of 2014. Facepunch owes Plaintiff 60% of the profits from all sales of the RUST Game in the past and going forward.

FACEPUNCH AND GARRY NEWMAN CREATE A
NEW EXPERIMENTAL VERSION OF RUST
USING ELEMENTS FROM THE ORIGINAL GAME

68.     In or around March, 2014, Plaintiff was told to write down a description of all of the work that he had done on RUST.  He understood that Facepunch was hiring additional people to work on RUST and he assumed that the purpose of preparing the summary document was to act as a reference guide to explain the operation of the code to the new hires.  He was told not to continue his work improving the game and he spent over one month compiling the reference material describing his work.  There were very few updates or improvements to the Original RUST game following April 2014.  The sales of RUST dropped dramatically after April 2014.

69.     Before Plaintiff was told that he would not continue working with Facepunch, he learned from one of the new employees that Facepunch was going to produce a new version of RUST.  A week or so later, Garry Newman announced online that Facepunch intended to release a completely new "experimental" version of RUST. Plaintiff was never asked to work on the new version and he was never given any access to the new version.  Garry Newman never discussed the new "experimental" version of RUST with Plaintiff.

70.     The experimental version was intended to replace the original game.  It has been marketed as a different version of the original game.  As of October of 2014, the Defendants announced about the RUST game, "we are working on RUST, just not the version the majority of players are experiencing."

71.     The new game ("experimental" version) copies the essential elements of the original RUST game and is substantially similar to the original RUST game.  The "experimental game" uses artwork and visual elements from the original RUST game or which are substantially similar to items used in the original RUST game, including the avatar, landscape, buildings, materials, blueprints, weapons and other elements.  Plaintiff Glynn is informed and believes and therein alleges that Defendants also copied aspects of the software, if not the literal source code, then other copyrightable aspects of the source code, including aspects of the structure, sequence, and organization.  The subsequent version of the game, euphemistically called the "experimental game," is merely a poorly conceived and executed derivative of the original RUST game.

GARRY NEWMAN AND FACEPUNCH COMMIT WASTE

72.     On or about May 23, 2014, Facepunch announced the release the "experimental" version of RUST in an unfinished state.  Players were given the option to play the original game, now called the "Legacy" version, or the new experimental version.  In July 2014, Facepunch announced it was abandoning the development of the original game that it was going to focus on new projects separate from RUST.

73.     The announcement caused a substantial backlash among the community of players who expected continued improvements to the original game.  The abandonment of

the development of the original game in favor of the new version has only increased the drop in sales.

74.     The wrongful acts of Defendants including but not limited to the stopping of Plaintiff from working on his game, marketing the game and receiving his 60% of the profits of the game took place within the state of Minnesota.   The Defendants communicated with Plaintiff in Minnesota and through their acts operated within the state of Minnesota while doing so.   The Defendants through their wrongful acts deprived Plaintiff of his rights.

75.     Newman committed waste by making changes to the original game, making harmful statements related to it, causing Facepunch to stop developing the original game even though it had been released as alpha and using the profits from RUST to pay more than a dozen people to work on the development of the experimental game which has been a failure.

76.     In an effort to further discourage the play of the original game and dilute the Plaintiff's claims for lost profits, Facepunch has set up a system where if a person pushes the button to play RUST it will automatically default to the subsequent version of the game, euphemistically called the "experimental game."  To play the original game, a player must specifically elect to do so.  The game RUST, as created by Plaintiff, is now referred to by Defendants as the "Legacy" game.

77.     The Defendants have acted wrongfully toward Plaintiff.  Their wrongful acts include but are not limited to in whole or in part copying the original RUST game's creations, modules, text and/or wording by colorable variation.

78.     Defendants have sought to deprive Plaintiff of the benefit of the original agreement through this switch from the game he originally created to the subsequent version of the game euphemistically called the "experimental game" which is a derivative and/or rework of the game as created by Plaintiff, thereby depriving Plaintiff of his just earnings and unjustly enriching Defendants at Plaintiff's expense.

79.     Defendant Garry Newman intentionally with knowledge did not invest in Plaintiff and honor the representation to pay him 60% of the profits, but instead stopped Plaintiff from working on the game and deprived him of the profits due to him from the RUST game.

80.     The Defendants' plan to replace the original game with the experimental game was a complete disaster.  Newman's effort to create the experimental game was and continues to be completely unsuccessful.   In or around December 29, 2014, while responding to complaints from the gaming community regarding development of the experimental game Newman admitted that the new game remained "virtually unplayable." This was true even though Newman had been working on the game for more than seven months and Facepunch had hired more than a dozen people to work on the game in the summer of 2014. The failure of the experimental game was directly related to Newman's inability to understand and work with sophisticated code languages and concepts, and his insistence on avoiding code complexity which is required to provide the game experience that made the original version of RUST such a great success.

81.     Defendant Garry Newman intentionally with knowledge frustrated the purpose of the original agreement and used a derivative called the "experimental" game to

fraudulently supplant the original game by making the "experimental" version of the game the default, which had the effect of destroying profits that should go to Plaintiff. Despite setting the experimental version of the game as the default version, Garry Newman claims people will continue to be able to enjoy the "Legacy" version, which was created by the Plaintiff, as the default is more unfinished and full of issues still. The Legacy version is the term applied to the original RUST game sometime after the "experimental version" became the version available to players by default. Further, Defendant Facepunch frequently refers to the "Legacy" as the baseline and consistently makes remarks of attempting to reach said baseline on the now default version (experimental game).

82. The sales of RUST have declined precipitously since March of 2014 as a result of the tortious actions of the Defendants. Consumer spending on the games industry for 2013 was $21.53 Billion with $15.39 Billion being spent on game content.[7] Plaintiff's profits from the sale of RUST have been slashed by the Defendants breach of the covenant of good faith and fair dealing and by Defendants destruction of the game.

FACEPUNCH AND GARRY NEWMAN DESTROY<br>THE VALUE OF THE ORIGINAL GAME<br>AND DEPRIVE PLAINTIFF OF THE<br>BENEFITS OF HIS WORK AND THE CONTRACT

83. Due to the changes made by Defendant Newman in the subsequent version of the game, euphemistically called the "experimental" version of RUST, it is plagued by view model issues that cause shadows on terrain to vibrate, view models to enter walls or

---

[7] Sales numbers from the Entertainment Software Association's 2014 Sales, Demographic and Usage Data: Essential Facts About the Computer and Video Game Industry.

the ground and jitter, referred to as boiling because of a lack of precision of the shared near and far plane.  Defendant Newman committed waste to the RUST game damaging Plaintiff.

84.     Newman committed waste by making changes to the original game, which negatively affected the player experience, limiting the ongoing development of the original game in favor of the experimental game, and ultimately abandoning the development of the original game before the "experimental game" was ready to be played.  Newman publicly claims the reason for penalizing the players is primarily only to simplify the code for his own development purposes.  All of this resulted in the loss of sales and downward spiral of the game's player counts.

85.     One of the exploits in the Unity3D game engine allowed RUST players to engage in the so-called Player Movement Exploit.  In RUST the Player Movement Exploit allowed players to cheat the game and enter otherwise secure player built structures, thus enabling the players cheating the game to gain an advantage such as being able to kill other players, raid their stock piles and engage in other actions that were not otherwise allowed in the game.   Rather than kicking such players off the servers, Newman took other unproductive steps in which Newman's acts frequently resulted in innocent players being penalized by randomly being placed away from their game location, ejected from the game, and/or other adverse game actions/consequences.  Further, Newman's relocation of players attempting to use an exploit would often result in that player being placed exactly where he or she was trying to go by using the exploit in the first place.

86.     The experimental version of RUST has been plagued by the Player Movement exploit because of Newman.

87.    Defendant Newman has incorporated another UI into the Original RUST game, which has been detrimental to the performance of the game and has resulted in player complaints, which Newman has ignored.  The failure to respond to complaints translates into players leaving the game for other gaming experiences that are more satisfying and playable.  Player dissatisfaction also leads to marketing problems as prospective customers are unlikely to purchase a slow game nor are they likely to purchase a game where the information in the game's community of players is that the game's developers are unresponsive and ignorant to the performance concerns of the players.

FACEPUNCH AND NEWMAN COMMITTED FRAUD

88.    Plaintiff reasonably anticipated working and improving on the game indefinitely to make the necessary changes to make it a "finished" product and thereafter he would still frequently make significant updates.  Defendants' representations made Plaintiff reasonably expect that he would be the author of the game with all accompanying rights, have a continuing access to improvements or enhancements, and rights to derivatives or copies of the game including the subsequent version of the game euphemistically called the "experimental game."

89.    Defendants fraudulently concealed that Defendants did not intend to keep their promises, but rather to misappropriate Plaintiff's creation once it had proven to be successful by supplanting his game with a subsequent version of the game, euphemistically called the "experimental game" from which he would receive none of the promised consideration.

90.     The Defendant promised to invest in the Plaintiff, which would include, but not be limited to, the original RUST game and what would flow from that game including the so-called "experimental game."

91.     In furtherance of Garry Newman and Facepunch Studios' fraud a new company Defendant Facepunch Limited was set up that is now believed to be marketing RUST without honoring the foregoing representations to Plaintiff.

92.     Plaintiff relied on Defendants false representations and was damaged because of them.

93.     Defendant Garry Newman made the foregoing representations then intentionally interfered with Plaintiffs economic advantage and contract by doing acts that were contrary to the effectiveness of the game, hurting the reputation of the game, making unreasonable responses to customers which hurt goodwill, making it difficult for the Plaintiff to get work done, wrongfully keeping Plaintiff from doing further work on the RUST game and destroying the benefit of the bargain Plaintiff had made with Defendants.

94.     Further, Newman created new companies, Facepunch Limited and Facepunch Group Limited in furtherance of defrauding Plaintiff.  Facepunch and Garry Newman in order to mislead the public and create a false excuse to deprive Plaintiff of his rights falsely made it appear as though they had full rights to the game, concealing the Plaintiffs rights to the RUST game.  In addition, on occasion, Defendant Newman has claimed the original team did not change.  Although his statement was made after Plaintiff was forced to discontinue working on the game.

95.     Contrary to their representation Defendants have not invested in Plaintiff, but rather misappropriated his code creations, have not protected his intellectual and property rights, have not provided to the Plaintiff written notice of their creating the derivative so-called experimental game, have not afforded Plaintiff a chance for him to participate in working on or enhancing the experimental game, have not paid Plaintiff his 60% share of the profits derived from the use of the experimental game, have failed to give Plaintiff proper recognition for his contribution to the creation of the game by failing to list Plaintiff as the/a creator of the game in the game's credits, and have failed to provide a full accounting to Plaintiff for the profits of the RUST game and any other derivative product or service.  Further, the Defendants have given misleading impressions related to the RUST game.   For example, the original RUST had gone without updates long before they announced the discontinued support of the original RUST.

96.     Further, the Defendants concealed Plaintiff's involvement with RUST by attending several Game conferences in the United States without acknowledging Plaintiff. Plaintiff later became aware of the studio attending both SteamDevDays, hosted by Valve Corporation, during January 2014 in Seattle, Washington and D.I.C.E. Summit 2014, hosted by Electronic Arts, during February 2014.

97.     The Defendants did not have the skill to develop the RUST game and depended on Plaintiff who reasonably relied upon the representations made by Defendants to induce him into his creating the RUST game.   Defendants intentionally withheld recognition of Plaintiff's work on RUST from the public while misappropriating credit for his work.   The Defendants intentionally took the work and development of Plaintiff and

then told him he was no longer working with Facepunch as an unfair approach to use as an excuse to get out of paying the Plaintiff the profits due to him. Plaintiff did not discover the foregoing fraud until after the original act.

### GARRY NEWMAN AND FACEPUNCH STUDIOS CREATED A HOSTILE WORK ENVIRONMENT

98.     During the course of his employment as an independent contractor he was forced to work in a hostile work environment that caused him emotional distress. Facepunch agents including Garry Newman, subjected Plaintiff to insulting, discriminatory, emotionally distressing and otherwise abusive behavior. Plaintiff was forced to work in a hostile work environment.

99.     Plaintiff was subjected to discriminatory remarks involving his United States national origin and disability. Further, Plaintiff's wife is originally from Hungary and Defendants have made discriminatory remarks about Hungarians that have caused distress to Plaintiff. Defendants made numerous discriminatory and abusive statements that created a hostile work environment. The Defendants knew Plaintiff has a learning disability ADHD and acted discriminatory toward him because of it including falsely accusing him of having Asperger's syndrome. Defendants would use the same common chat room to discuss matters of RUST. Plaintiff would largely be distanced from producing any relationships with others because of his lack of interest in participating in and/or contributing to the frequent offensive nature of the chat room.

100.    Defendant Facepunch's website regarding jobs states as follows:

"Do I have to move to England? No. We have employees from all over the world."

With respect to work hours, the website states:

> You are a grown up.  We aren't going to babysit you.  You're not a convict making license plates. You are here because you are awesome at what you do.  We trust you to make decisions.  We're not going to tell you what hours to work.  You can work that out yourself.  If you work best by starting at 2AM then you can work at 2AM.  If you work best from home, then work from home.  This only works if you're self-motivated.  No one is going to tell you to work differently, it's up to you to find how you're most effective.

101.    Despite the Defendants' representations that Plaintiff could work from his home and set his own hours, Plaintiff was criticized and pressured to adjust his hours to suit Defendants, even when doing so interfered with his health.  Defendants' agent went so far as to tell Plaintiff to do without his prescription.

102.    A sampling of remarks by Defendants agents involving national origin (Americans) are as follows:

> On 4/10/2013 Garry Newman about Wendy's restaurant, "its where fat familys go to eat in america"
>
> On 4/18/2013 Garry Newman, "the footage of the texas explosion is kinda funny because everyone has texas t-shirts on"
>
> On 4/18/2013 from Maxime labeled: "mmurica'
>
> On 4/18/2013 from Tom: "they wear them so they can remember where they are"
>
> "helping each other out I guess"

On 4/18/2013 from Maxime Labeled: "not sure if you're implying that people in texas are so dumb they need t-shirts to remember where they are"

On 4/18/2013 from Tom: "I had a step mum who was from texas and she was on another level"

On 4/19/2013 from Maurino Berry: "boston on complete lockdown no transit etc and another bomb may have just gone off"

On 4/19/2013 from Garry Newman: "I dropped a bomb in the bathroom this morning"

On 5/29/2013 from Garry Newman: "I've got athletes foot"

On 5/29/2013 from Garry Newman: "it's funny what you find on the streets in Boston"

On 8/20/2013 from Garry Newman: "do you know what they call a dentist in america

On 8/20/2013 from Megan Tupper: "extreme tooth technician"

On 8/20/2013 from Garry Newman: "no, a dennist"

On 9/4/2013 from William Ford: "That's just stupid. How can even get it in your mouth. No wonder Americans are fat cunts."

On 1/7/2014 from Garry Newman: "the best way to cut off a redneck's cock… kick his sister in the jaw"

103.   A sampling of remarks involving disability are as follows:

On 2/7/2013 from Maurino Berry to Plaintiff: "don't take your meds dude… if that's the problem"

On 2/7/2013 from Maurino Berry in telling Plaintiff to work the hours he preferred and to do without taking his prescription: "there's no way you are telling me you are just doomed to never be able to keep normal hours… it makes no sense how you can consistently keep bizzare nighthawk hours but cannot consistently keep regular-person hours"

On 12/6/2013 from Tom: "like he has tourettes[8]"

On 12/6/2013 from Maurino Berry: "I thought tourettes meant you yelled like you can't control the volume"

On 01/23/2014 from Maurino Berry: "don't tell me you're going to get all aspergery"

On 01/22/2013 from Garry Newman: "this guy must have aspergers, he's sent me about 20 emails this week about GWEN"

On 4/4/2013 from Maurino Berry: "prob just 13 year old spergers who freak so fuck em drop dat b0mb:

On 5/7/2013 from Garry Newman: "I think he's probably a sperger too though, so don't wanna piss him off too much"

On 6/19/2013 from Garry Newman: "its got aspergers all over it"

On 11/22/2013 from Garry Newman: "I think he's a sperger"

---

[8] Tourette syndrome (TS) is a neurological disorder characterized by repetitive, stereotyped, involuntary movements and vocalizations called tics.  Source: http://www.ninds.nih.gov/disorders/tourette/detail_tourette.htm

104.    While working for Defendants he was forced to work in an environment that encouraged racism, gender discrimination and other types of abusive language.  The use of discriminatory and abusive language was so widely used that the non-use of it created a barrier in communication with other employees.   Defendant Garry Newman not only condoned but actively used discriminatory and abusive language in the Defendants chat room and made clear his gender discrimination in his exclusion of women as characters in the RUST game that only had male avatars.  What follows are some of the discriminatory and abusive statements that contributed to the hostile work environment.

105.    A sampling of remarks involving race are as follows:

On 05/08/2013 from Garry Newman:  "sam doesn't believe me that black people have heavy bones"

On 7/10/2013 from William Ford: "everyone knows black people can't make a decent bacon sandwich though."

On 7/12/2013 from William Ford: "it's like hip-hop though Neil people of all races can appreciate it but only black people are really good at it."

On 10/11/2013 from Garry Newman: "yeah black people have heavy bones"

On 10/11/2013 from Marino Barry: "ha ha I don't know what's up with the whole black people and swimming thing all"

On 11/14/2013 from Marino Barry: "they carry umbrellas around in the summer so they don't get a tan because it's associated with being poor and working in the fields and shit"

106.    A sampling of remarks involving women are as follows:

On 1/28/2103 from Garry Newman: "when I say vagina to Sarah[9] I call it a Cock Hole"

On 1/28/2013 from Maurino Berry: "cock holster"

On 1/28/2013 from Garry Newman: "Your cock hole stinks!"

On 1/28/2013 from Garry Newman: "Your cock hole is too hairy!"

On 5/23/2013 from Garry Newman: "pretty much all books that 60+ women read are either kids being abused or women getting fucked"

On 6/11/2013 from Garry Newman: "if I want to see naked women I'll watch porn"

On 6/14/2013 from Garry Newman: "am I the only one who rate women's worth by the size of their arms"

On 6/24/2013 from Garry Newman: "there is no women, they all died because of their ovaries or something"[10]

On 7/29/2013 from Garry Newman: "counter offer with his mom's soiled underwear."

On 8/12/2013 from Garry Newman:  "I've seen men trained like dogs by women who bollock them when they don't answer their phones"

---

[9] Garry's girlfriend and mother of his son,
[10] This statement was Garry's explanation for the lack of in-game women in RUST.  This is an alleged plot line by Garry Newman to support the exclusion of women, which was offensive to Plaintiff.

On 1/8/2014 from William Ford: "remember Neil that with some women no means no."

On 2/11/2014 from Garry Newman: "new keyboard with LEDs – we need 10 women dancing on stage right now"

On 5/30/2014 from Neil Pettit: "I think national media coverage would be fairly easy to get for rust? Just put different races in and women, and get some professor of anthropology or psychology to comment about whites on Blacks ganging up, or men gang up on women."

107.   A sampling of remarks involving sex are as follows:

On 3/26/2013 from Garry Newman: "I can't start a wank[11] because sarah left her phone here, so I can't see where she is on find friends"[12]

On 3/26/2013 from Garry Newman: "this is how wanks used to be"

On 3/26/2013 from Maurino Berry: "why don't you just wait for her to come home and b@ng her"

On 3/26/2013 from Garry Newman: "cuz she is knocked up and is having horny mood swings"

On 4/15/2013 from Maurino Berry: "we're all gunna look so dumb when our wives and girlfriends come home and we're using them"

---

[11] "Wank" is a predominantly British term for masturbation.  Source: http://www.urbandictionary.com/define.php?term=wank
[12] "Find Friends" is an application for mapping the real-time position of others.

On 4/15/2013 from Garry Newman: "even dumber when it's got 3D lookaround porn"

On 4/15/2013 from Garry Newman: "are you watching porn and get distracted by their house"

On 4/15/2013 from Maxime Lebled: "what if you turn and you see the cameraman wanking in your face all of a sudden"

On 4/15/2013 from Garry Newman: "like wtf[13] they don't want to get cum[14] on the sofa"

On 4/15/2013 from Maurino Berry: "if it were you, you'd get a bigger erection"

On 4/15/2013 from Garry Newman: "max would probably look for signs that the porn women were being mistreated"

On 4/15/2013 from Maurino Berry: "so I guess they could do lookaround porn for you garry"

On 4/15/2013 from Maurino Berry: "but unless you wanted like.. the point of view of a girl getting wanked on by 50 guys"

On 4/15/2013 from Garry Newman: "porn cameraman are the worst"

On 4/15/2013 from Maurino Berry" "you're quite the porno connoseur garry haha"

On 4/15/2013 from Maxime Lebled: "garry: video games, porn, same fight"

---

[13] "WTF" shorthand for "what the fuck"
[14] "Cum" semen

40

On 4/15/2013 from Maurino Berry: "'the shit I have to deal with… sigh… *unzips*'"

On 5/7/2013 from Garry Newman: "probably had to disguise his erection"

On 5/9/2013 from Garry Newman: "is it a wanking glove"

On 5/9/2013 from Garry Newman: "if I caught my dad masturbating in the shower with a dildo the last thing I would do would be to tell you guys about it"

On 5/9/2013 from Garry Newman: "or deep throat the dildo"

On 7/19/2013 from Craig Gwilt: "u know the best thing about the school run… all the milfs[15]"

On 7/19/2013 from William Ford: "I drive past a school on the way to work. I've nearly smashed my car up about 20 times"

On 7/19/2013 from Craig Gwilt: "I usually wear my sunglasses so I can have a perv[16] without them seeing my eyes"

On 7/19/2013 from Craig Gwilt: "perv and proud"

---

[15] "Milfs" "Mother I'd Like (to) Fuck" mothers, whether married, separated or divorced, that a male individual sees as physical attractive enough to want to have sexual intercourse with them. Just cuz their moms doesn't mean that they don't need a spark in their love life. If they've ever breastfed, they have really responsive nipples and a core of erectile tissue in their breasts. The ones in good shape have worked at regaining control over their vaginas (Kegel exercises).MILFs are usually real careful about birth control, they know accidents happen but they take responsible steps. They want to fuck with abandon, with no romantic complications for their under-19 family. A MILF is any mother that is sexually desirable.  Source: http://www.urbandictionary.com/define.php?term=milf
[16] "Perv" short for pervert.

On 7/19/2013 from Craig Gwilt: "I think its ok to be a perv until you reach about 50, then its just wrong"

On 7/19/2013 from Craig Gwilt: "if anything, older men SHOULD perv more cus lets face it, they aint gonna have fitties waiting for them at home, but it's just a bit creepy"

On 7/22/2013 from Sammii Cronshaw: "u all eat beef?[17]"

On 7/22/2013 from Craig Gwilt: "curtains?[18]"

On 7/22/2013 from Craig Gwilt: "u offering?"

On 7/22/2013 from Neil Pettitt: "I can't wait for this royal baby to be born, jsut so the blanket coverage stops."

On 7/22/2013 from Sammii Cronshaw: "haha its defo gna b a girl!"

On 7/22/2013 from Neil Pettitt: "I just really, really hope its black."

On 7/22/2013 from Tom: "I bet she poops when give birth"

On 7/31/2013 from Neil Pettitt: "I used to work with a Hungarian and he claimed it was common in hungary to pull the wings off a fly, and whilst in the bath, poke the end of your knob out of the water and let the fly run around it like a little volcanic island, whilst you wanked."

On 7/31/2013 from Craig Gwilt: "I wonder if the Earth is just the end of God's knob and we are all running around while he wanks."

---

[17] "eat beef" can refer to cunnilingus.
[18] "curtains" or "beef curtains" refers to the resulting low hanging, loose, flappy labia of the female genitalia; Source:
http://www.urbandictionary.com/define.php?term=beef+curtains

On 8/19/2013 from Maurino Berry: "I did not know Bradley manning was transexual"

On 8/19/2013 from Maurino Berry: they get reassignment surgery and then wear strapons[19] to do women"

On 8/27/2013 from William Ford: "Probably the violent wankathons through"

On 10/25/2013 from Neil Pettitt "'I just looked up beaver[20] fisting[21]'"

On 10/25/2013 from Maxime Lebled: "DON'T RISK YOU SUPPLY TO NAKED BASTARDS trying to hide your shit from hackers I hard enough as it is now you have to worry about penis danglers that want your shit"

On 10/25/2013 from Maxime Lebled: "petition to rename newspawns in rust to "penis danglers"

On 12/6/2013 from Garry Newman: "did you ever see that guy that wanks in hotels so maids walk in on him"

On 12/6/2013 from Maurino Berry: "I still never saw the vid[22] you told me about with the guy who fucked some other guys car"

On 12/6/2013 from Garry Newman: "then I'd slap my dick on his car's windscreen"

---

[19] A dildo that is used by women. It has a device so it can be "strapped" on. Mainly used for lesbian sex. Source: http://www.urbandictionary.com/define.php?term=strap+on
[20] "Beaver" refers to vagina; Source:
http://www.urbandictionary.com/define.php?term=beaver
[21] "Fisting" refers to using putting a fist in a rectum or vagina Source:
http://www.urbandictionary.com/define.php?term=fisting
[22] "Vid" means video.

On 12/6/2013 from Maurino Berry: "there has to be someone who does everything fucked up"

On 12/6/2013 from Maurino Berry: "but like that girl addicted to sniffing her own urine like its drugs, come on"

108.  A sampling of remarks involving feminism are as follows:

On 9/6/2013 from Neil Pettit: "More: Feminist Men aren't right in the head."

109.  "A sampling of remarks involving the poor are as follows:

On 6/14/2013 from Garry Newman: "did you see that fat woman complaining that she was gonna be poor because her benefits were being cut from 30k a year to 25k"

110.  A sampling of remarks involving sexuality are as follows:

On 5/13/2013 from Garry Newman: "I'm not gay but I would suck Ryan Gostling off"

On 5/13/2013 from Craig Gwilt: "everyone should say who they would turn gay for"

On 11/22/2013 from Garry Newman: "tom can send a picture of his testicles to kids in his spare time"

On 12/4/2013 from Garry Newman: "like how gay PPL don't masturbate to themselves in the mirror"

On 6/24/2013 from Garry Newman:  "there is no women, they all died because their ovaries or something."[23]

111.    On or about December 24, 2014 Newman admitted in response to a post on the Internet questioning the wisdom of abandoning RUST and that the experimental game was not as playable as the original or "Legacy" RUST game and that he had decided to stop making upgrades to the Legacy game.

112.    The Internet post appeared on Reddit at:

http://reddit.com/r/playrust/comment2/2/qa713/garry_fked_up

and on the Facepunch DevBlog at:

http://playrust.com/devblog-40#more-2280

where members of the gaming community and anyone else interested in the development of Facepunch games, including other game developers can learn more about what is happening with the development of RUST and the experimental game.

113.    The Internet postings are accessible to anyone worldwide who has access to the Internet.

114.    Newman admitted he stopped making upgrades to the Legacy game and claimed it was because the code was too complicated.

---

[23] This statement was to indicate the lack of in-game women in RUST.  This is an alleged plot line by Garry Newman to support the exclusion of women, which was offensive to Plaintiff.

115.    He further claimed that the reason the code was complicated was because the person who wrote the code (Plaintiff) had "serious problems" and referred to the problems as "asperger type problems."

116.    Newman and Berry and others at Facepunch accused Plaintiff of having Aspergers on more than one occasion.

117.    On or about December 24, 2014, Defendant Garry Newman published a defamatory statement on the internet in response to a comment posted on the Internet questioning why Garry Newman and Facepunch stopped work on RUST and instead had replaced RUST with the "experimental game."  Defendant Newman, stated:

> Legacy's code was awful.  It wasn't just shitty code, it was over-engineered.  It's a common thing for the next programmer to mock the previous guy's code – but the previous guy had serious problems, asperger type problems."

The foregoing statement was published on the Internet at:

http://www.reddit.com/r/playrust/comment2/2/qa713/garry_fked_up

http://playrust.com/devblog-40#more-2280[24]

both web addresses are in the public domain.

118.    On or about December 28, 2014, in a publication over the internet on Reddit, Newman made the following statement ascribing Asperger syndrome to Plaintiff.  The statement was:

---

[24] This posting linked the reader to the posting on Reddit and is still an active link.

Legacy's code was awful. It wasn't just shitty code, it was over-engineered. It's a common thing for the next programmer to mock the previous guy's code – but the previous guy had serious problems, asperger type problems.

The statement referred to Plaintiff and people could understand that it referred to him.  This statement was not true.

119.    People in the gaming community and the game development community know that Plaintiff wrote the code for the legacy version of RUST.

120.    Plaintiff does not have Aspergers.

121.    Defendants' extraterritorial behavior adversely affected commerce and harmed a United States citizen, the Plaintiff Patrick Glynn.

122.    The foregoing remarks and behavior by Defendants and their agents are some examples that show the hostile work environment and of what caused Plaintiff to undergo emotional distress.

FIRST CLAIM FOR RELIEF BREACH OF CONTRACT
(BY PLAINTIFF GLYNN AGAINST DEFENDANTS FACEPUNCH STUDIOS AND NEWMAN)

123.    The allegations of the previous paragraphs are realleged and incorporated herein by reference in this paragraph as though fully set forth herein.

124.    Defendants Facepunch Studios and Newman are responsible for the actions of Defendant Newman as he was and/or with their knowledge held himself out as their agent and representative.

125.    Under the doctrine of *respondeat superior*, Defendant Facepunch Studios is liable for his actions.

126.    Plaintiff was hired by Facepunch Studios to develop games as an independent contractor, and it promised to invest in him, including paying expenses plus 60% of "all the profits" obtained in relation to such games.   The contract was in full force and effect when Plaintiff developed the RUST game with Facepunch Studios as set forth earlier herein. Plaintiff accepted Facepunch Studios' promises.   The contract was complete with offer, acceptance and consideration.   Defendants offer to Plaintiff included consideration of investing in him, and paying him his recurring 60% of the profits received from all games he worked on and all derivatives, whether based on an entire game and/or on aspects and/or features of a game whether used in RUST, any derivative of RUST and/or any other game plus an amount of money for expenses.   Plaintiff accepted Defendant's offer for the considerations promised.

127.    Facepunch Studios breached the agreement of the parties by failing to pay Plaintiff his percentage of the profits derived from the game RUST.   The parties were aware when they made the agreement and understood and intended that once a computer game was developed, it would generate profit through many different channels, including but not limited to, in-game sales, merchandising, sales of new versions with added features, or sales of new versions.   The parties' intent was that Plaintiff would receive 60% of all profits derived from the continuing development of the game.

128.    Defendant Facepunch Studios breached its contract when it failed to honor its aforementioned promises.   Facepunch Studios has breached its duty to pay consideration including investing in him and paying 60% of the profits of games he created, derivatives

of games created by Plaintiff and/or aspects and features created by Plaintiff whether used in RUST, derivatives of RUST and/or any other game.

129.    The total agreement included from Facepunch Studios promises made by Garry Newman, the President of Facepunch Studios, and his e-mail to the Plaintiff, and receipts and billing for payments made to Plaintiff.

130.    By instructing Facepunch Studios to stop giving new projects to Plaintiff, Garry Newman has caused a breach of the contract and frustrated the purpose of the contract.

131.    Plaintiff has duly performed all of the terms and conditions of the agreement on his part to be performed.   Defendant Facepunch Studios breached its contractual promise to Plaintiff to pay him 60% of the profits of the game.   Defendant cut Plaintiff out of original game, now "Legacy', but is still using an experimental version of the game as well as the original game.   Any profits not paid by Defendants to Plaintiff has created a breach of contract claim due to Plaintiff to be paid by Defendant.   The Defendants have intentionally tried to set about a course of abandoning the original game in a ploy to get out of its duty to pay the Plaintiff for his work done.   Further, Defendant Garry Newman has attempted to further breach the contract and give an excuse for Facepunch Studios not paying Plaintiff by creating new companies Facepunch Limited and Facepunch Group Limited to market the RUST game.

132.    Defendants have not used their best efforts in dealing with the contract.

133.    As a direct and proximate result of Defendants, breach of contract Plaintiff has suffered injury and lost employment opportunities.    Facepunch Studios' aforementioned breach has caused Plaintiff to be damaged in excess of $75,000.00.

SECOND CLAIM FOR RELIEF
BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(BY PLAINTIFF GLYNN AGAINST DEFENDANTS FACEPUNCH STUDIOS AND NEWMAN)

134.    The allegations of the previous paragraphs are realleged and incorporated herein by reference in this paragraph as though fully set forth herein.

135.    Defendant Facepunch Studios is responsible for the actions of Defendant Newman as he was and/or with their knowledge held himself out as their agent and representative.

136.    Under the doctrine of *respondeat superior*, Defendant Facepunch Studios is liable for his actions.

137.    There was a covenant of good faith and fair dealing between the Plaintiff and Defendant Facepunch Studios, in the underlying contract.  A covenant of good faith and fair dealing is implied in fact in the contract.

138.    The contract required implicitly that each party act in good faith towards the other party in performing, enforcing, carrying out the terms of the contract.  The Defendant acted in bad faith in doing acts that have the effect of injuring or destroying the rights and/or ability of the Plaintiff to receive the benefits of the contract.

139.    Plaintiff accepted Defendant Facepunch Studios' promises as set forth in the agreement and gave valuable consideration to the Defendant.  Plaintiff fulfilled all that was required of him while Defendant acted in bad faith by Facepunch destroying the benefit of

the bargain Plaintiff had made with Defendant.  Defendant, in bad faith, stopped Plaintiff from working on the game and deprived him of the profits due to him from the RUST game. Defendant in bad faith frustrated the purpose of the original agreement by the development of the experimental game to supplant the original game, which had the effect of destroying profits that should go to Plaintiff.

140.    Facepunch Studios made promises to Plaintiff regarding his status as an independent contractor that were not kept by Facepunch Studios. Based on the promises made to Plaintiff by Facepunch Studios, Plaintiff performed all that was required of him under the contract.  Plaintiff was damaged by Facepunch Studios' failure to keep its promises.

141.    By instructing Facepunch Studios to stop giving new projects to Plaintiff, Garry Newman has caused a breach of the contract and frustrated the purpose of the contract.

142.    By Facepunch Studios' stopping Plaintiff from working on the game, marketing the game and giving Plaintiff new projects to work on, Defendant has breached the contract and frustrated the purpose of the contract.  Defendant has acted in direct contradiction to the representations made by Defendant to Plaintiff, Defendant has not protected his intellectual and property rights, not provided to the Plaintiff written notice of their creating the derivative so-called "experimental game," did not give him the opportunity to participate in working on or enhancing the so-called "experimental game," did not pay to Plaintiff his 60% share of the profits derived from the "experimental game," failed to place on the RUST game credit for the Plaintiff creating the game, failed to

provide a full accounting to Plaintiff for the profits of the RUST game and any other "experimental game," derivative product or service.

143.   Defendant Facepunch Studios cut Plaintiff out of original game, now called "Legacy', but is still using an experimental version of the game as well as the original game. Any profits not paid by Defendant to Plaintiff has created a breach of the covenant of good faith and fair dealing claim by Plaintiff against Defendant.  Defendant Facepunch Studios has intentionally tried to set about a course of abandoning the original game in a ploy to get out of its duty to pay the Plaintiff for his work done.  Further, Defendant Garry Newman has attempted to further breach the covenant of good faith and fair dealing and give an excuse for Facepunch Studios not paying Plaintiff by creating a new company Facepunch Limited that markets the RUST game.

144.   Defendant has not used its best efforts in dealing with the contract.

145.   By the use of the new game it is a clear breach of the implied covenant of good faith and fair dealing and created competition through the new so-called experimental game.

146.   As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered injury and lost employment opportunities.  Facepunch Studios' aforementioned breach has caused Plaintiff to be damaged in excess of $75,000.00.

THIRD CLAIM FOR RELIEF
INTENTIONAL INFLICTION OF MENTAL AND EMOTIONAL DISTRESS
(BY PLAINTIFF GLYNN AGAINST DEFENDANTS FACEPUNCH STUDIOS AND NEWMAN)

147.    The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference as though fully set forth.

148.    The contractual relationship between Plaintiff and Defendant Facepunch Studios requires a greater obligation to refrain from inflicting mental or emotional distress than would apply to a relationship between strangers.

149.    Defendants knew Plaintiff had a learning disability and ADHD.  Defendants discriminated against Plaintiff, falsely remarked about his having Asperger syndrome and made fun of Hungarian people knowing his wife was of Hungarian descent.  Defendant Facepunch Studios had a duty to refrain from humiliating, abusive and degrading behavior towards Plaintiff.

150.    Defendant Facepunch Studios violated that duty by its abusive, discriminatory and insulting conduct intentionally and/or in reckless disregard of Plaintiff's interests.  Defendants accused Plaintiff of having Asperger's. Defendants knew or should have known that emotional distress was certain or substantially certain to result because of their abusive, discriminatory and insulting conduct.

151.    Defendant Facepunch Studios and its employees intentionally created an abusive, discriminatory and hostile work environment for Plaintiff due to Facepunch Studios' policy and practice of using abusive, discriminatory and insulting approaches to working with Plaintiff.

152.    During the course of his employment as an independent contractor, Plaintiff was subjected to discriminatory and otherwise upsetting remarks involving national origin (Americans), disability, race, women, feminism, the poor, and sex/sexuality.  Defendants repeatedly made discriminatory remarks related to his disability and about the United States knowing Plaintiff was a citizen of it.

153.    Facepunch Studios followed an intentional, severe, pervasive and continuous course of outrageous and unfair behavior directed toward severely harming Plaintiff through the date of this Complaint.  The Defendant repeatedly abused the Plaintiff.

154.    Facepunch Studios', conduct toward Plaintiff was extreme and outrageous and was intentionally done knowing it would upset and damage Plaintiff.  Facepunch, intentionally subjected Plaintiff to a discriminatory, unwholesome, hostile, and abusive work environment where insults and related harassment were pervasive.

155.    Facepunch Studios' conduct was intentional and caused Plaintiff severe mental and emotional distress.

156.    Facepunch Studios' conduct was so atrocious and outrageous that it passed the boundaries of decency and is utterly intolerable to the civilized community.  The extreme and outrageous nature of the conduct arises from the abuse by Defendants of their relationship and position which gave them actual or apparent power to damage Plaintiff's interests.

157.    That as a direct and proximate result of Facepunch Studios' intentional infliction of severe mental and emotional distress Plaintiff was severely damaged in excess of $75,000.00.

FOURTH CLAIM FOR RELIEF
NEGLIGENCE OF OFFICERS, NEGLIGENCE OF SUPERVISION, AND NEGLIGENT RETENTION
(BY PLAINTIFF GLYNN AGAINST DEFENDANTS FACEPUNCH STUDIOS AND NEWMAN)

158.    The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference in this paragraph as if fully set forth.

159.    Facepunch Studios had a duty of due care to the Plaintiff herein.  It was foreseeable that if Facepunch Studios, did not follow its duty of care Plaintiff would be injured.  Facepunch Studios, and its officers, managers and agents failed to exercise due care through the date of this Complaint to Plaintiff and he was damaged.

160.    Plaintiff alleges Defendant Facepunch Studios, by and through its agents and managers, had a duty to Plaintiff.  This duty comprised the use of due care in making sure that the working environment was not hostile toward independent contractors such as Plaintiff.  Further, Facepunch Studios had a duty to refrain from deceptive practices. Defendant Facepunch Studios breached its duty of care and the standard of care and prudence necessary in overseeing the working environment and by means of the methods in which Facepunch Studios handled matters related to Plaintiff.  Facepunch Studios by and through its managers and officers, was negligent in handling its business affairs through the date of this Complaint.

161.    Defendant Facepunch Studios had a duty of care to take reasonable steps in selecting, training, retaining, and supervising its staff, supervisors, managers and work force to insure that Facepunch Studios' that independent contractors were reasonably safe from discriminatory or other unreasonable behavior by Facepunch Studios or its agents.  It was foreseeable that if Facepunch Studios did not honor its duty the Plaintiff would be

harmed.  Facepunch Studios was negligent in performing that duty.  Plaintiff was directly harmed because of Facepunch Studios' negligence through the date of this Complaint.

162.    Defendant Facepunch Studios should have taken reasonable steps to make sure that its supervisors, managers and employees did not act improperly or cause damage to the public and other Facepunch Studios' employees.  It was foreseeable that if Facepunch Studios' employees acted improperly the Plaintiff would be harmed.  Defendant Facepunch, was negligent in performing the above duties.  The employer knew or should have known of the discriminatory and other improper conduct; and the employer failed to take timely and corrective action.  Plaintiff was harmed because of Facepunch Studios' negligence. Facepunch Studios negligently allowed Plaintiff to suffer damages through the loss of the benefit of the bargain he had made with Defendant and to suffer emotionally because of Garry Newman and other of Defendant Facepunch Studios' agents or employees.  Further, Defendants negligently stopped Plaintiff from working on the game and deprived him of the profits due to him from the RUST game.  Defendants breached their duty of care by frustrating the purpose of the original agreement and using a derivative called the experimental game to supplant the original game, which has the effect of destroying profits that should go to Plaintiff.

163.    Defendant Facepunch Studios was negligent in breaching its duty as set forth in the previous paragraphs.  There was a foreseeable risk of harm to Plaintiff that was known to Facepunch Studios.  Facepunch Studios breached its duty of care and was negligent, which caused damage to the Plaintiff through the date of this Complaint.

164. As a direct and proximate result of Facepunch Studios' foregoing acts, the Plaintiff has suffered injury and lost employment opportunities. Facepunch Studios' aforementioned negligent acts caused Plaintiff to suffer mental and emotional distress and he was damaged in excess of $75,000.00.

FIFTH CLAIM FOR RELIEF
INTERFERENCE WITH ECONOMIC ADVANTAGE AND CONTRACT
(BY PLAINTIFFS BUBBLE PONY AND GLYNN
AGAINST DEFENDANTS FACEPUNCH AND NEWMAN)

165. The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference in this paragraph as if fully set forth.

166. An enforceable prospective contract existed between Plaintiff Glynn and Defendant Facepunch Studios. Plaintiffs Bubble Pony and Glynn had a reasonable expectation of economic advantage as a result of the contract between Plaintiff Glynn and Defendant Facepunch Studios. Defendants Facepunch and Newman had knowledge of Plaintiffs' expectation of economic advantage. Defendants Facepunch and Newman intentionally interfered with Plaintiffs' reasonable expectation of economic advantage and the intentional interference was independently tortious or in violation of a state or federal statute or regulation. But for Defendants Facepunch and Newman's intentional, wrongful and tortious actions, it is reasonably probable that Plaintiff would have realized an economic benefit. As a result of Defendants Facepunch and Newman's intentional, wrongful and tortious actions Plaintiffs sustained damage. An enforceable prospective contract existed between Plaintiff Glynn and Facepunch Studios.

167.    Defendants Facepunch and Garry Newman had knowledge of the aforementioned contract between the parties.

168.    Defendants Facepunch and Newman tortiously interfered with Plaintiff's economic advantage and contracted by abandoning the development of the original RUST game, preventing Plaintiff from continuing to develop and improve the original game, and attempting to replace the original game with the experimental game.

169.    Defendant Garry Newman controlled the actions of Facepunch Studios and in connection with the severing of the business relationship with Plaintiff Glynn.

170.    Defendant Newman intentionally acted with actual malice against Plaintiff Glynn in order to appropriate the profits due to Plaintiff Glynn from Facepunch Studios and subsequent Facepunch corporate entities as well as the recognition and credit for the continuing development of the RUST game.

171.    Defendant Newman further had actual malice because he always intended to convert the work of Glynn for his own profit and never intended to pay Plaintiff 60% of the profits from the sales of games developed by Plaintiff Glynn.

172.    The actions taken by Garry Newman to interfere with the contractual arrangements between Facepunch Studios and Glynn were intentional, wrongful and tortious and with actual malice.

173.    The Defendants' acts were wrongful and interfered with the contractual rights of the Plaintiff.

174.    As a direct and proximate result of Defendants' foregoing intentional acts, the Plaintiff has suffered injury and lost business opportunities.    Defendants'

aforementioned wrongful acts caused Plaintiff to suffer mental and emotional distress and he was damaged in excess of $75,000.00.

SIXTH CLAIM FOR RELIEF
FRAUD
(BY PLAINTIFF GLYNN AGAINST DEFENDANT FACEPUNCH STUDIOS)

175.    The allegations of the previous paragraphs are realleged and incorporated in this paragraph by reference as though fully set forth herein.

176.    In connection with the payment of Plaintiff's bonus, Facepunch Studios employed a scheme, common course of conduct, and conspiracy to defraud Plaintiff.  As part of this scheme, common course of conduct and conspiracy to defraud, Facepunch Studios made intentional, knowing, false and fraudulent statements and representations with scienter to Plaintiff and/or failed to state facts necessary in order to make the statements made.  The foregoing acts by Defendants were misleading.  These false representations by Facepunch Studios had to do with past or present facts related to how the game would be handled by Facepunch Studios and compensation due to Plaintiff.  The representations made by Facepunch Studios to Plaintiff were susceptible of knowledge.

177.    Defendant used fraud in the inducement to get Plaintiff to enter into an agreement to create games.  The fraudulent statements of Facepunch Studios were known to it to be untrue when made and Facepunch was susceptible to knowledge.  The fraudulent statements were made to induce Plaintiff to enter the agreement.  On September 28, 2010, Facepunch Studios stated to Plaintiff that it was going to invest in him and that he was going to receive 60% of the profits of the games he created.  These false statements were intentional and knowingly made with scienter and induced the Plaintiff to enter into an

agreement with Facepunch Studios causing him damage.  Further, Defendant's agent by comments falsely led Plaintiff to continue to work on RUST by representing that he should organize a company to handle the large profits he would make and that he would need a device to help carry all the money he was going to make on the game.

178.    Facepunch Studios made a false representation on September 28, 2010, that Facepunch Studios would pay 60% of the profits of the RUST game to Plaintiff.  This representation was not true since Facepunch did not intend to do it when made.  Further, Facepunch Studios did not in fact pay the proper amount of profits due to Plaintiff. Facepunch Studios did not provide accountings for profits to Plaintiff and wrongfully stopped Plaintiff from working on the game and thereafter did not pay him for profits of the game.  Facepunch Studios fraudulently baited Plaintiff to work on the game while concealing that it intended if the game was successful to stop the Plaintiff from working on the game, cut off paying Plaintiff any money and spin off a derivative game that would drain away any profits due to Plaintiff.  In furtherance of the fraud Defendant Garry Newman created Defendant Facepunch Limited and Facepunch Group Limited to market the RUST game and does not pay profits of it to Plaintiff.  Defendants have contrary to their false representation not invested in Plaintiff but rather misappropriated his code creations, not protected his intellectual and property rights, not provided to the Plaintiff written notice of their creating the derivative so-called experimental game and a chance for him to participate in working on or enhancing  it, made payment of profits derived from the use of the experimental game, failed to place on the RUST game credit for the Plaintiff

creating the game, provide a full accounting to Plaintiff for the profits of the RUST game and any other derivative product or service.

179.   Facepunch Studios' intentional, knowledgeable with scienter, false and/or fraudulent statements, representations, concealments, and/or omissions as to Plaintiff's 60% interest were material in that there was a substantial likelihood that Plaintiff would have considered these important in deciding whether or not to continue to develop the RUST game with the company and/or pursue relief.

180.   Each of the foregoing acts of fraud by Facepunch Studios was made intentionally, knowingly, with scienter.

181.   Facepunch Studios was in a position to know that its statements as set forth above were untrue and it was susceptible of knowledge.

182.   Facepunch Studios also knew that if Plaintiff did not know the truth, then he would rely upon the foregoing representations made by it and its agents.  Defendant was aware of the youth, lack of education, disability and inexperience of Plaintiff and took advantage of his vulnerability.

183.   Plaintiff was induced by Facepunch Studios to go along with its agents' foregoing representations.  Plaintiff's actions were in reliance upon the representation of Facepunch Studios and its agents.   Plaintiff reasonably relied upon Defendants representations and did work in reliance on the foregoing representations.

184.   Plaintiff suffered damage because of these representations by Facepunch Studios and its agents.  The damage Plaintiff experienced was related to the representations and non-disclosure by Facepunch and its agents.   By following Facepunch Studios'

fraudulent representation and/or concealment Plaintiff lost money and was thereby damaged.

185.    Facepunch Studios' intentional, false and fraudulent statements with scienter induced Plaintiff into accepting an independent contractor relationship with Facepunch Studios, continuing work with Facepunch Studios and not pursuing relief for non-payment of the proper percentage to him.   The representations, concealments and omissions of Facepunch Studios were fraudulent.  Facepunch Studios was responsible for the acts of its President Garry Newman and other of its agents under *respondeat superior*.  Plaintiff relied on Facepunch Studios' representations, which were not true, and Facepunch Studios did not believe that its promises were true when made.  Facepunch Studios intentionally, knowingly with scienter defrauded Plaintiff by making the aforementioned fraudulent statements, concealments, omissions and untrue assertions.  Facepunch Studios committed the foregoing fraud intentionally and knowingly with scienter fully understanding that its fraud was harmful to Plaintiff and in violation of existing law

186.    Plaintiff was ignorant of the falsity of Facepunch Studios' statements and omissions, believed Facepunch Studios' representations to him to be true, and reasonably relied on their truth and accuracy.   In reasonable reliance on Facepunch Studios' representations of material fact and/or the fidelity, integrity, fiduciary responsibility and/or superior knowledge of Facepunch Studios and in ignorance of the true facts, Plaintiff was wrongly and fraudulently induced to, and did accept employment by it and continued to work for it.

187.    Facepunch Studios has intentionally and knowingly with scienter not performed the conditions of its contracts with the Plaintiff in that, among other things, it has failed to pay the proper share of the profits due to Plaintiff Glynn.

188.    Facepunch Studios' foregoing representations imposed a duty of honoring its representations.  Facepunch Studios including its agents, were obligated to carrying out its obligations and representations to Plaintiff.

189.    Defendants induced Plaintiff to continue to work on the game by representing to him that he would become rich.  In November of 2013 Craig Gwilt, a Director of Facepunch Studios communicated to Plaintiff, "… u will need to by a shovel as well to shovel all of the money around…" in sending the message to Plaintiff how much money he was going to make.  This sent the message to Plaintiff he would become rich working on RUST.

190.    Later on the January 27, 2014 Craig Gwilt sent another message inducing Plaintiff to work on RUST because of all the money he was going to make.  Mr. Gwilt said, "…your next RUST bonus is gonna be paid on 1st March and I wondered if you have put any thought into the tax you will be paying as it will likely be a quite sizeable payment."

191.    Plaintiff did not discover Facepunch Studios and its' agent's fraud until after the original act.

192.    Facepunch Studios and its agent's misrepresentations were the actual and proximate cause of damage to the Plaintiff.

193.    The Defendant's foregoing representations were false.  They had to do with a past or present fact that is material and susceptible to knowledge.  The Defendant knew

it to be false or asserted the fact without knowledge of whether it was true with the intent to induce Plaintiff Glynn to act.  Plaintiff Glynn was induced to act in reliance on the Defendant's representations.  The Plaintiff suffered damages attributable to the foregoing false representation.

194.    As a direct and proximate result of Defendant Facepunch Studios' fraud, Plaintiff has been damaged in excess of $75,000.00.

SEVENTH CLAIM FOR RELIEF
FRAUD BY GARRY NEWMAN
(BY PLAINTIFF GLYNN AGAINST DEFENDANT NEWMAN)

195.    The allegations of the previous paragraphs are realleged and incorporated in this paragraph by reference as though fully set forth herein.

196.    Garry Newman used fraud in the inducement September 28, 2010, to get Plaintiff to enter into an agreement to create computer games.  On September 28, 2010, Defendant intentionally, knowingly with scienter falsely represented to Plaintiff that Facepunch would invest in Plaintiff and pay him 60% of the profits realized on games created by Plaintiff.  At the time these representations were made Garry Newman knew they were untrue and that they would induce Plaintiff to act.  Plaintiff was induced by the foregoing fraud and he was damaged.

197.    Garry Newman intentionally, knowingly with scienter fraudulently misled Plaintiff into believing that if he accepted working with Facepunch he would receive all the promised compensation set forth by Garry Newman and that Defendants would be investing in him.  Before Plaintiff took the job at Facepunch, Garry Newman falsely represented to him that the compensation would include his being paid expenses and 60%

of the profits of any games created by him.  Plaintiff was induced to work on games with Facepunch Studios by Garry Newman's intentional with scienter false representation that it was a fact that he was offering Plaintiff permanent work, investing in him and paying compensation of 60% of the profits of the RUST game.  At the time of Garry Newman's material misrepresentation he knew that it was untrue.

198.    Garry Newman through his agent induced Plaintiff to continue to work on the game by representing to him that he would become rich.  In November of 2013 Craig Gwilt, a Director of Facepunch, who was an agent of Newman communicated to Plaintiff, "… u will need to by a shovel as well to shovel all of the money around…"in sending the message to Plaintiff how much money he was going to make.

199.    Later Craig Gwilt sent another message inducing Plaintiff to work on RUST because of all the money he was going to make.  Mr. Gwilt said, "…your next RUST bonus is gonna be paid on 1st March and I wondered if you have put any thought into the tax you will be paying as it will likely be a quite sizeable payment."

200.    Garry Newman and Facepunch Studios have knowingly, intentionally and with scienter used fraudulent tactics that have damaged Plaintiff.

201.    Garry Newman knowingly, intentionally and with scienter made the foregoing fraudulent material misrepresentations personally and through an agent as to contract terms including compensation to the Plaintiff knowing they were untrue. Defendant made the representations, or caused them to be made, knowing them to be false and with intent to defraud and deceive the Plaintiff and to induce him to accept employment with Facepunch Studios and later to continue to work with Facepunch Studios.  These false

representations by Garry Newman and/or his agent had to do with a past or present fact and the representation was susceptible of knowledge.

202. Newman, contrary to the representations made to Plaintiff, has not invested in Plaintiff but rather misappropriated his code creations, not protected his intellectual and property rights, not provided to the Plaintiff written notice of their creating the derivative so-called experimental game, did not give Plaintiff a chance to participate in working on or enhancing the so-called experimental game, did not make payment of profits derived from the experimental game to Plaintiff, failed to place on the RUST game credit for the Plaintiff creating the game, and failed to provide a full accounting to Plaintiff for the profits of the RUST game and any other derivative product or service.

203. Plaintiff, in reliance on Garry Newman and believing his representations, was induced to action and thereby damaged. Each of the foregoing acts of fraud by Garry Newman and/or his agent was done knowingly, intentionally and with scienter. Garry Newman made false and material representations to the Plaintiff to induce the Plaintiff to accept employment with Facepunch Studios and to continue to work for it. Garry Newman was in a position to know that his statements were untrue and he was susceptible of knowledge. At the same time that Garry Newman was promising to pay Plaintiff 60% of the profits, he was concealing that he was depleting the earnings of the game by creating an experimental version of the game to supplant the game created by Plaintiff. Garry Newman also knew that the Plaintiff did not know the truth and relied upon Facepunch and its agents. Garry Newman knew his statements were false and intended that the Plaintiff be induced to act and follow his promises. He falsely advised Plaintiff to believe

Facepunch Studios' representation.  Plaintiff was induced by Garry Newman to go along with Facepunch Studios and its agents' false representations.  The Plaintiff's actions were in reliance upon the representation of Garry Newman and/or his agent.  The Plaintiff suffered damage because of these representations by Garry Newman and/or his agent.  The damage Plaintiff experienced was related to the foregoing fraud by Garry Newman and/or his agent.  By accepting the fraudulent promises of Garry Newman and/or his agent, Plaintiff lost money.

204.   Plaintiff relied on Defendant Garry Newman's and/or his agent's false representations.  Defendant Garry Newman made the foregoing representations then intentionally interfered with Plaintiff's economic advantage and contract by doing acts that were contrary to the effectiveness of the game, making it difficult for the Plaintiff to get work done, wrongfully keeping Plaintiff from doing further work on the RUST game and destroying the benefit of the bargain Plaintiff had made with Defendants.  Defendant Garry Newman intentionally, knowingly with scienter did not invest in Plaintiff and honor the representation to pay him 60% of the profits, but instead stopped Plaintiff from working on the game and deprived him of the profits due to him from the RUST game.  Defendant Garry Newman intentionally, knowingly with scienter frustrated the purpose of the original agreement and used a derivative called the experimental game to fraudulently supplant the original game, which had the effect of destroying profits that should go to Plaintiff.  Further, after Plaintiff created the RUST game Garry Newman created Defendants Facepunch Limited and Facepunch Group Limited which market the RUST game and has not paid Plaintiff the profits owed to him.

205.    Plaintiff believed Garry Newman and/or his agent and as a result of Garry Newman's and/or his agent's intentional, knowledgeable, with scienter misrepresentations, he was damaged.

206.    Plaintiff did not discover Garry Newman's and/or his agent's fraud until after the original act.

207.    The Defendant Newman's foregoing representations were false.  They had to do with a past or present fact that is material and susceptible to knowledge.  The Defendant knew it to be false or asserted the fact without knowledge of whether it was true with the intent to induce Plaintiff Glynn to act.  Plaintiff Glynn was induced to act in reliance on the Defendant's representations.  The Plaintiff suffered damages attributable to the foregoing false representation.

208.    Garry Newman's and/or his agent's misrepresentations were the actual and proximate cause of damage to the Plaintiff.

209.    Plaintiff was damaged by the failure of Garry Newman to honor the representations made by him and/or his agents to Plaintiff.  Plaintiff has been damaged in excess of $75,000.

EIGHTH CLAIM FOR RELIEF
BREACH OF FIDUCIARY DUTY
(BY PLAINTIFF GLYNN AGAINST DEFENDANT FACEPUNCH)

210.    The allegations of the previous paragraphs are realleged and incorporated in this paragraph by reference as though fully set forth herein.

211.    Facepunch Studios had a fiduciary relationship with and responsibility to Plaintiff and owed to him the highest fiduciary obligation.  Defendant had a fiduciary duty

to Plaintiff.   Facepunch Studios breached its fiduciary duties and acted in gross, reckless and/or intentional disregard of the injury and risk of loss it inflicted on Plaintiff.  Garry Newman was an agent of Facepunch Studios and it is responsible for his actions under *respondeat superior.*

212.    Plaintiff placed his trust and confidence in Facepunch Studios, believing in good faith that Facepunch Studios would competently discharge its duties.  As a result, Facepunch was placed into, and held a position of, dominance, trust and influence over Plaintiff.

213.    As a result of the affirmative misrepresentations and the concealment of material facts alleged in this Complaint, Facepunch Studios breached its fiduciary duties that were owed to Plaintiff.

214.    Due to Facepunch Studios' acts and omissions, Plaintiff was caused to systematically lose bonus and related long-term investment.

215.    As a direct and proximate result of the foregoing breach of fiduciary duty Plaintiff has been damaged in excess of $75,000.00.

NINTH CLAIM FOR RELIEF
BREACH OF FIDUCIARY DUTY
(BY PLAINTIFF AND GLYNN AGAINST DEFENDANT NEWMAN)

216.    The allegations of the previous paragraphs are realleged and incorporated in this paragraph by reference as though fully set forth herein.

217.    Defendant Garry Newman had a fiduciary duty to Plaintiff.  Garry Newman breached his fiduciary duties and acted in gross, reckless and/or intentional disregard of the injury and risk of loss it inflicted on Plaintiff.  Each of the foregoing acts of fraud by

Garry Newman were done intentionally and with scienter knowing that in doing so he was in breach of his fiduciary duty to Plaintiff.   Garry Newman made false and material representations to Plaintiff to induce Plaintiff to accept employment and to continue to work for Facepunch.   Garry Newman was in a position to know that his statements were untrue and he was susceptible of knowledge.   Garry Newman also knew that the Plaintiff did not know the truth and relied upon Facepunch and its agents.   Garry Newman knew his statements were false and intended that the Plaintiff be induced to act and follow his advice. He advised Plaintiff to believe Facepunch's representations.   Plaintiff was induced by Garry Newman to go along with Facepunch and its agents' representations.   Plaintiff's actions were in reliance upon the representation of Garry Newman who had a fiduciary duty to the Plaintiff.   Plaintiff suffered damage because of Garry Newman's breach of fiduciary duty.   The damage Plaintiff experienced was related to the foregoing breach of fiduciary duty by Garry Newman.

218.    Plaintiff placed his trust and confidence in Garry Newman, believing in good faith that Garry Newman would competently discharge his duties.   As a result, Garry Newman was placed into, and held a position of, dominance, trust, and influence over the Plaintiff.

219.    As a result of the affirmative misrepresentations and the concealment of material facts alleged in this Complaint, Garry Newman breached the fiduciary duties that were owed to the Plaintiff.

220.    Due to Garry Newman's acts and omissions, Plaintiff was caused to systematically lose money due him and a long-term investment.

221.    As a direct and proximate result of the foregoing breach of fiduciary duty, Plaintiff has been damaged in excess of $75,000.00.

TENTH CLAIM FOR RELIEF
UNJUST ENRICHMENT AND IMPOSITION OF A
CONSTRUCTIVE TRUST
(BY PLAINTIFFS BUBBLE PONY AND GLYNN AGAINST DEFENDANTS FACEPUNCH)

222.    The allegations of the previous paragraphs are realleged and incorporated by reference in this paragraph as though fully set forth herein.

223.    By virtue of the relationships between the parties and the facts as stated above, a constructive trust should be established over the monies paid due to the Plaintiff for his 60% of the profits.  Such monies are traceable to Defendants Facepunch who are the current possessor of such funds.

224.    Despite Facepunch Studio's representations to the contrary, Facepunch has not paid the Plaintiff 60% profits due him.

225.    Facepunch  engaged  in  omissions,  intentional  and  fraudulent misrepresentations with scienter, negligence, concealment and improper practices that resulted in the depletion of proper percentage of profits due to Plaintiff and/or non-payment of percentage of profits due him.  Absent the omissions, the intentional and fraudulent misrepresentations with scienter, concealment, depletions, improper deductions and improper practices the bonus would not have been paid.

226.    Defendants Facepunch will be unjustly enriched if it is allowed to retain the funds due the Plaintiff for profits; therefore a constructive trust should be imposed on all monies wrongfully obtained by Facepunch.

227.  Plaintiff has no adequate remedy at law.

228.  As a direct and proximate result, Plaintiff has been damaged in excess of $75,000.00.

ELEVENTH CLAIM FOR RELIEF
FRAUDULENT CONCEALMENT/OMISSION
(BY PLAINTIFF GLYNN AGAINST DEFENDANTS FACEPUNCH)

229.  The allegations of the previous paragraphs are realleged and incorporated by reference in this paragraph as though fully set forth herein.

230.  Facepunch Studios and its agents misrepresented or omitted material information from Plaintiff.

231.  Facepunch Studios and its agents, made false representations to Plaintiff to induce him to start working with Facepunch Studios and to continue to work with it. Defendant Garry Newman, on behalf of Facepunch Studios, falsely, intentionally and with scienter represented that Facepunch Studios was investing in Plaintiff and Plaintiff was to receive 60% of the profits of games he worked on. Defendants concealed that they intended to misappropriate Plaintiff's work by taking it to create derivatives for which Facepunch Studios would not pay Plaintiff profits. Further, Defendant omitted to tell Plaintiff that Facepunch Studios was only using him to create a successful game and then intended to end his relationship with it. Defendant intentionally represented to Plaintiff that it was investing in him because it wanted to establish a long-term relationship with him, this was known to him to be untrue when made and was never done by Defendant.

232.    Defendants Facepunch and their agents omitted to explain that they were purposely depleting earnings of the RUST game by using a derivative new experimental RUST game to supplant the game created by the Plaintiff.

233.    Defendants Facepunch and their agents deliberately used delay tactics, withheld information, manipulated the payments as to when they were made and deliberately used up earnings to deplete them so that Plaintiff did not get his rightful share of the profits.  Defendants did the foregoing acts while concealing them from Plaintiff.

234.    Defendants Facepunch and their agents intentionally, knowingly and with scienter concealed and/or omitted known facts from Plaintiff.   The facts that were concealed from Plaintiff were known to Defendants Facepunch and were material. Defendants Facepunchs' intentional concealed the rightful profits due to Plaintiff, were planning on using the Plaintiff's services without intending to pay him his rightful profits and the fact that they were spinning off a derivative game of RUST to deprive Plaintiff of his rightful profits.

235.    Defendants Facepunch and their agents knew that Plaintiff relied on this non-disclosure.

236.    Defendants Facepunch and their agents had a duty to communicate the true and complete facts to the Plaintiff including that it was not going to give him 60% of the profits, was not investing in him, intended to use him to create a successful game and then deprive him of his rightful claims.

237.    Defendants Facepunch and their agents by their representations created a fiduciary duty to Plaintiff.  Defendants were holding profits for release to Plaintiff had a

fiduciary duty to safeguard and properly distribute those profits, which it did not do, nor did it intend to do.  They had special knowledge that Plaintiff did not have that made it necessary to disclose and clarify information.

238.    Despite knowing of the need to disclose information to Plaintiff, it was not done by Defendants Facepunch and their agents.  They omitted to disclose material information to Plaintiff.

239.    Defendants Facepunch and their agents knew that Plaintiff relied upon them and would be induced to act by their non-disclosure.

240.    Defendants Facepunch and their agents concealed and/or omitted to disclose material information to the Plaintiff knowing that they would be induced to act by the non-disclosure.

241.    Plaintiff was induced to act by the foregoing concealment and/or omissions of Facepunch Studios and its agents.

242.    Plaintiff's acts were in reliance on the non-disclosure of Defendant Facepunch Studios and its agents

243.    The foregoing concealment and/or omissions by Facepunch Studios and its agents induced Plaintiff to act to his detriment.

244.    Plaintiff did not discover the foregoing concealment and/or omissions until after the original act.

245.    The Defendants Facepunch and their agents' foregoing concealment and/or omissions were fraudulent.  They had to do with a past or present fact that is material and susceptible to knowledge.  The Defendant knew its omissions and concealment would

damage Plaintiff but still omitted and concealed with the intent to induce Plaintiff Glynn

to act.  Plaintiff Glynn was induced to act in reliance on the Defendant's concealment

and/or omissions.  The Plaintiff suffered damages attributable to the foregoing fraudulent

concealment and/or omissions.

246.    Plaintiff has suffered damages by the foregoing fraudulent concealment

and/or omissions.  The concealment and/or omissions were the actual and proximate cause

of damage to Plaintiff in excess of $75,000.00.

TWELFTH CLAIM FOR RELIEF
FRAUDULENT CONCEALMENT/OMISSION
(BY PLAINTIFF GLYNN AGAINST DEFENDANT NEWMAN)

247.    The allegations of the previous paragraphs are realleged and incorporated by

reference in this paragraph as though fully set forth herein.

248.    Garry Newman misrepresented or omitted material information from

Plaintiff.

249.    Garry Newman made false representations to Plaintiff to induce him to start

working with Facepunch Studios and to continue to working with it.  He falsely,

intentionally and with scienter represented that Facepunch Studios was investing in

Plaintiff and Plaintiff was to receive 60% of the profits of games he worked on.  Garry

Newman concealed that he intended to misappropriate Plaintiff's work by taking it to create

derivative games on which Facepunch would not pay Plaintiff his rightful profits.  Further,

Garry Newman omitted to tell Plaintiff that Facepunch Studios was only using him to

create a successful game and then intended to end his relationship with it.  Defendant

intentionally represented to Plaintiff that Facepunch was investing in him because it wanted

to establish a long-term relationship with him.  Garry Newman also did not disclose to Plaintiff that he intended to create new entities Defendant Facepunch Limited and Defedant Facepunch Group Limited that would market and otherwise deal with the RUST game.

250.    Garry Newman omitted to explain that they were purposely depleting earnings of the RUST game by using a derivative new experimental RUST game to supplant the game created by the Plaintiff.

251.    Garry Newman deliberately used delay tactics, withheld information, manipulated the payments as to when they were made and deliberately  used up earnings to deplete them so that Plaintiff did not get his rightful share of the profits.

252.    Garry Newman concealed and/or omitted known facts from Plaintiff.  The facts that were concealed from Plaintiff were known to Facepunch and were material. Defendants intentional concealed the rightful profits due to Plaintiff, were planning on using the Plaintiff's services without intending to pay him his rightful profits, the fact that they were spinning off a derivative game of RUST and creating a new entity Defendant Facepunch Limited to deprive Plaintiff of his rightful profits.

253.    Garry Newman knew that Plaintiff relied on this non-disclosure.

254.    Garry Newman had a duty to communicate the true and complete facts to the Plaintiff.

255.    Garry Newman by his representations created a fiduciary duty to Plaintiff. Defendants were holding profits for release to Plaintiff and had a fiduciary duty to safeguard and properly distribute those profits, which Newman did not do, nor did he

intend to do so.  He had special knowledge that Plaintiff did not have that made it necessary to disclose and clarify information.

256.    Despite knowing of the need to disclose information to Plaintiff, it was not done by Garry Newman.  He omitted to disclose material information to Plaintiff.

257.    Garry Newman knew that Plaintiff relied upon them and would be induced to act by his non-disclosure.

258.    Garry Newman concealed and/or omitted to disclose material information to the Plaintiff knowing that they would be induced to act by the non-disclosure.  Defendant Garry Newman has created an intentionally misleading record related to Facepunch by creating both Facepunch Limited and Facepunch Group Limited.  Plaintiff was induced to act by the foregoing concealment and/or omissions of Garry Newman.

259.    Plaintiff's acts were in reliance on the non-disclosure of Garry Newman.

260.    The foregoing concealment and/or omissions by Garry Newman induced Plaintiff to act to his detriment.

261.    Plaintiff did not discover the foregoing concealment and/or omissions until after the original act.

262.    The Defendant's foregoing concealment and/or omissions were fraudulent. They had to do with a past or present fact that is material and susceptible to knowledge. The Defendant knew the omissions and/or concealment would damage Plaintiff and omitted and concealed with intent to induce Plaintiff Glynn to act.  Plaintiff Glynn was induced to act in reliance on the Defendant's concealment and/or omissions. The Plaintiff suffered damages attributable to the foregoing fraudulent concealment and/or omissions.

263.     Plaintiff has suffered damages by the foregoing concealment and/or omissions.  The concealment and/or omissions were the actual and proximate cause of damage to Plaintiff in excess of $75,000.00.

THIRTEENTH CLAIM FOR RELIEF
EQUITABLE ESTOPPEL
(BY PLAINTIFF GLYNN AGAINST DEFENDANTS FACEPUNCH AND NEWMAN)

264.     The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference as though fully set forth.

265.     Garry Newman made promises to Plaintiff to induce him into creating games. Newman promised Plaintiff that if he created games he would receive all the promised compensation set forth by Garry Newman and that Defendants would be investing in him. Before Plaintiff accepted creating games Garry Newman represented to him that the compensation would include his being paid expenses and 60% of the profits of any games created by him.  Plaintiff was induced to work on games with Facepunch Studios by Garry Newman's promises that it was offering Plaintiff permanent work, investing in him and paying compensation of 60% of the profits of the RUST game.

266.     Defendants have acted contrary to the foregoing promises.  Defendants promised Plaintiff 60% of the profits on the games he created.  Defendants' further promised that they were investing in Plaintiff.  Instead, Defendants misappropriated Plaintiff's code creations, did not protect his intellectual and property rights, did not provide to Plaintiff written notice of their creating the derivative so-called experimental game, did not provide Plaintiff a chance to participate in working on or enhancing the so-called experimental game, did not pay Plaintiff his 60% profits from the use of the

experimental game, failed to place on the RUST game credit for the Plaintiff creating the game, did not provide a full accounting to Plaintiff for the profits of the RUST game and any other derivative product or service.

267.    Plaintiff in reliance on Garry Newman's foregoing promises was induced to action and thereby damaged.

268.    Plaintiff relied on Defendant Garry Newman's promises.

269.    Defendants Facepunch have failed to keep the promises set forth above up to the date of this Complaint.

270.    That as a result of the aforementioned promises by Defendant Facepunch Studios, promises that were relied on by Plaintiff to his detriment, he was humiliated as an employee at Facepunch Studios and forced to work in an environment where he was subjected to mental and emotional distress.

271.    Facepunch Studios' aforementioned promises and Plaintiff's reliance to his detriment on these promises has damaged Plaintiff and Defendants Facepunch should be estopped from not keeping its promises to Plaintiff under equitable estoppel.

272.    The Defendants should be prevented from asserting or denying the foregoing allegations because of prior conduct by which its contrary position has been admitted or implied.   The Plaintiff's action in being induced by Defendants into foregoing other employment opportunities to work on games that could be used by Facepunch coupled with Defendants action in paying the Plaintiff over $600,000.00 on profits of the RUST game and non-action in denying while Plaintiff worked with it a duty to invest in him and pay him 60% of the profits creates a situation where equitable estoppel should be imposed.  The

Defendants has by its conduct confirmed that it promised to pay Plaintiff expenses and 60% of the profits. After Plaintiff created the RUST game Defendants paid him in excess of $600,000.00 which he understood was being paid as a partial payment on his share of the profits. This sum of money supports that Defendants had made such promises as set forth above to Plaintiff. Defendants cannot now deny their duty to honor all of their promises when at no time have they ever denied to the Plaintiff that they had a duty to honor these promises. They had a duty to speak the truth and their silence is an admission that they know they have a duty to honor all promises made to the Plaintiff. The Plaintiff was induced to rely on the Defendants foregoing promises to his detriment.

273.     As a direct and proximate result of Facepunch's failure to honor its promises Plaintiff has suffered injury, lost wages and benefits, suffered emotional distress, and lost employment opportunities. Facepunch's aforementioned wrongful acts damaged Plaintiff in excess of $75,000.00.

## FOURTEENTH CLAIM FOR RELIEF
### PROMISSORY ESTOPPEL
#### (BY PLAINTIFF GLYNN AGAINST DEFENDANT FACEPUNCH STUDIOS AND NEWMAN)

274.     The allegations of the previous paragraphs are realleged and incorporated herein by reference in this paragraph as though fully set forth herein.

275.     Plaintiff was retained by Facepunch Studios to create computer games. Facepunch Studios promised to invest in him and pay further consideration including expenses and 60% of the profits of games he worked on.

276.     Facepunch Studios has not kept its promises up to the date of this complaint in 2014.

277.    Inherent in Facepunch Studios' promise was that Plaintiff, among other things, would receive compensation that included expenses and 60% of the profits of the games he created.  The promise of investing in him raised the expectation in Plaintiff that he was going to get permanent work with Facepunch where he would be secure and safe from losing the promised compensation and/or being forced to quit working on the games he created.

278.    That as a result of the aforementioned promises by Defendant that were relied upon by Plaintiff to his detriment, he has incurred a financial loss.

279.    The promises made by Defendant to Plaintiff were intended to make Plaintiff rely upon them and the Plaintiff did rely upon them.  The Defendant promisor should have reasonably expected reliance by Plaintiff, which in fact did in the instant case induce Plaintiff to work on the RUST game and forgo other business opportunities.

280.    Facepunch Studios' aforementioned promises and Plaintiff's reliance to his detriment on these promises has damaged Plaintiff and Facepunch should be estopped from not keeping its promises to Plaintiff under promissory estoppel.

281.    As a direct and proximate result of Facepunch Studios' promises and Plaintiff's reliance to his detriment on said promises, the Plaintiff has sustained and continues to sustain substantial losses in earnings causing Plaintiff damages in excess of $75,000.00.

FIFTEENTH CLAIM FOR RELIEF
ACCOUNTING
(BY PLAINTIFFS BUBBLE PONY AND GLYNN
AGAINST DEFENDANTS FACEPUNCH AND NEWMAN)

282.    The allegations of the previous paragraphs are realleged and incorporated in this paragraph by reference as though fully set forth herein.

283.    Plaintiff Glynn and the Defendants have an agreement whereby Facepunch was and is to pay Plaintiff Glynn 60% of the profits of the RUST game and owed a fiduciary duty to account to Plaintiff Glynn for such profits.

284.    On information and belief, between August 2013 and the commencement of this action the Defendant has collected tens of millions of dollars from the sale of the RUST game.

285.    Prior to the commencement of this action, Defendants have not paid over to Plaintiff Glynn or Plaintiff Bubble Pony, Inc., Plaintiff Glynn's rightful 60% share of profits.  By virtue of the contract with Facepunch Studios, Facepunch has a continuing fiduciary duty to account to Plaintiffs for all of the profits received in connection with the sales of RUST, and Plaintiffs are entitled to an accounting of all cash and non-cash compensation received in connection with the sale of RUST and on any other games for which Plaintiff Glynn was a contributor.

286.    By virtue of Plaintiff's status as a joint author and joint owner of RUST, Facepunch has a duty to account for all of the above profits generated by the original RUST game and any derivative games.

287.    On information and belief, between September of 2013 and the commencement of this action the Defendant has collected large sums of income from the sale of RUST. The amount of money due from Defendants to Plaintiff is unknown to Plaintiff, and cannot be ascertained without an accounting of the income and expenses relating to the sales of RUST in order to establish the profits generated and the amount due to Plaintiff.  Defendants should have to provide a full and accurate accounting of all income and expenses related to the RUST game.

288.    Plaintiff is informed and believes that the amounts due greatly exceed $75,000.00.

SIXTEENTH CLAIM FOR RELIEF
DECLARATORY JUDGMENT
(BY PLAINTIFFS BUBBLE PONY AND GLYNN AGAINST DEFENDANTS FACEPUNCH)

289.    The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference as though fully set forth.

290.    Pursuant to Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, an actual controversy exists the with respect to the Plaintiffs' ownership rights of the game known as RUST, and any derivatives thereof, as well as to the amount of profits to which Plaintiff is entitled from these games, or any other games created, derived from and/or which utilize the copyrightable work in the original RUST.

291.    Pursuant to Minnesota Statutes Chapter 555 [Uniform Declaratory Judgments Act] and Rule 37 of the Minnesota Rules of Civil Procedure, an actual controversy exists the with respect to the ownership rights of the game known as RUST

and all derivatives thereof as well as to any and all other games created, derived from and/or which utilize Plaintiff's code creations.

292.    Plaintiff requests that the Court declare the rights, status, and interests of the parties herein with respect to the game known as RUST and all derivatives thereof as well as to any and all other games created, derived from and/or which utilize Plaintiff's code creations.

293.    Plaintiff Glynn was the primary designer of the original game "RUST" in that he contributed more than 75% of the source code for the game, and artwork, and he was responsible for key elements of the games look and feel critical to the games success. Plaintiff Glynn collaborated with Facepunch employees on the creation of continuing versions of the original RUST game between 2012 and May 30, 2014, and each contributed independently copyrightable content, with the intention that their respective contributions be merged into inseparable or interdependent parts of a unitary whole;

294.    The original RUST game, and all of the versions of the original RUST game created by the parties, are "Joint Works" within the meaning of Section 101 of the Copyright Act 117 U.S.C. § 1011.  Plaintiff Glynn was a co-author of the original RUST game, and a joint owner of the copyrights with Defendant Facepunch, holding an indivisible fifty-percent interest therein, under 17 U.S.C. §. 201(a).

295.    As joint owner, Plaintiff Glynn, during his lifetime, had a right to an accounting from Defendant Facepunch, for any and all profits obtained as a result of Defendant's exploitation of the Joint Works, under 17 U.S.C. SS 101 and 201(a).

296.   As joint owner, Plaintiff has the right to publish and otherwise exploit the Joint Works independently of Defendant Facepunch in the United States, subject only to his duty to account to Defendant Facepunch the share of the profits so obtained.

297.   Defendant has wrongfully refused to recognize Plaintiff Glynn's co-authorship and current co-ownership of all versions of the original RUST game and other Joint Works, intending to appropriate all profits from the exploitation of the Joint Works for themselves.

298.   An actual, present, and justiciable controversy exists between Plaintiff and Defendant, as to whether all versions of the original RUST game are "Joint Works," whether Plaintiff Glynn is a co-author and joint owner thereof; with all rights and obligations attendant to this status; and, whether Defendant has a duty to account to Plaintiff.

299.   Plaintiffs seek a Declaratory Judgment, pursuant to 28 U.S.C. §2201, decreeing: that all versions of the original RUST game are "Joint Works" under 17 U.S.C. §101; that Plaintiff Glynn is a joint author and joint owner of all versions of the original RUST game and other Joint Works, under 17 U.S.C. §201(d); that Defendants have a duty to account to Plaintiffs for all profits arising, directly or indirectly, from Defendant's exploitation of any copyright in the Joint Works, including any profits arising from the sale of the "experimental game" or Defendant's licensure or authorization of others to use, exploit, or adapt the Joint Works, within, or outside, the United States; Plaintiff Glynn is entitled to access to all of the Joint Works; and Plaintiff Glynn has the right to exploit the Joint Works independently of the Defendants.

300.    The damages to Plaintiff are in excess of $75,000.00.

SEVENTEENTH CLAIM FOR RELIEF
WASTE
(BY PLAINTIFFS BUBBLE PONY AND GLYNN AGAINST ALL DEFENDANTS)

301.    The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference as though fully set forth.

302.    The original RUST was a huge success and sold over a million copies in the first three months after its release on Steam in December 2013.

303.    In or around March of 2014, Plaintiff was told to prepare a written description of all the work he had done on RUST.  Plaintiff believed the reason for the request was to have it serve as a reference guide to explain the operation of the game and the game's source code.

304.    At the same time that Plaintiff was instructed to create the summary or written guide for the game, he was also instructed not to do any further work on the game.

305.    Beginning in March of 2014, at the time Plaintiff was instructed by Facepunch and Garry Newman to prepare the summary and not to do any further work on the game, the sales of the game began to decline sharply.

306.    In or about June 2014, Facepunch released the "experimental" version of RUST in an unfinished state. Players were given the option to play the original game, now called the "Legacy" version, or the new experimental version.  In July, 2014, Facepunch announced it was abandoning the development of the original game that it was going to focus on improving the experimental version.  The announcement caused a substantial

backlash among the community of players who expected continued improvements to the original game.

307.    The Defendants' plan to replace the original game with the experimental game was a complete disaster.  Newman's effort to create the experimental game was and continues to be completely unsuccessful.   In or around December 29, 2014, while responding to complaints from the gaming community regarding development of the experimental game Newman admitted that the new game remained "virtually unplayable." This was true even though Newman had been working on the game for more than seven months and Facepunch had hired more than a dozen people to work on the game in the summer of 2014.

308.    Defendants committed waste by negligently and intentionally making harmful changes to the original game, making harmful statements related to the original game, stopping support and development of the original game even though it was released as alpha, and using the profits from the sales of the original game to hire people to work on development of the experimental game which has been a failure.

309.    Defendants' negligence and/or intentional conduct have caused material damage to the value of the copyrights in the original game and have resulted in substantial damages to Plaintiffs.

310.    Following Plaintiff being told he would no longer be working with Facepunch, Facepunch and Newman committed waste by negligently and intentionally making harmful changes to the original RUST game, making harmful statements related to the original RUST game, by stopping Plaintiff Glynn from continuing to work to improve

the original RUST game, by stopping all further development of the original RUST game even though it had been released as an "Alpha" and using the profits from RUST to pay more than a dozen people to work on the development of the experimental game which has been a failure.

311.    As a direct and proximate result of the foregoing actions of waste committed by Facepunch and Newman, Plaintiffs Glynn and Bubble Pony, Inc., have been harmed in excess of $75,000.00.

EIGHTEENTH CLAIM FOR RELIEF
MISAPPROPRIATION OF IDEAS
(BY PLAINTIFF GLYNN AGAINST DEFENDANTS FACEPUNCH AND NEWMAN)

312.    The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference as though fully set forth.

313.    Defendants misappropriated Plaintiff Glynn's ideas in the creation of the so-called "experimental game."

314.    Defendants misappropriated Plaintiff Glynn's ideas using the original RUST game as a template for the "experimental" game.

315.    The changes made to the "experimental" game by Defendants have resulted in the "experimental" game being less playable and a less satisfying player experience.

316.    Defendants' abandonment of support for and on-going development of the original RUST game before the "experimental" version was ready to be played and marketed has damaged Plaintiff.

317.    Defendants have benefited from the improper, unfair and unauthorized use of Plaintiff's ideas with respect to the development of the subject game.

318.    Defendants have knowledge and fully appreciate the benefits it has received from Plaintiff's ideas with respect to the development of the subject game.

319.    Defendants have profited from the use of Plaintiff's ideas.

320.    Plaintiff is entitled to receive an amount equal to the value of the benefits obtained by Defendants' misappropriation of Plaintiff's ideas.

321.    Defendants' actions in misappropriating Plaintiff Glynn's ideas is the direct and proximate cause of damage to Plaintiffs Glynn and Bubble Pony, Inc.

322.    The damages to Plaintiffs are in excess of $75,000.00.

NINETEENTH CLAIM FOR RELIEF
LIBEL FOR FALSE AND DEFAMATORY INTERNET POSTING ABOUT PLAINTIFF
(BY PLAINTIFF GLYNN AGAINST ALL DEFENDANTS)

323.    The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference as though fully set forth.

324.    Defendant Garry Newman intentionally with malice made defamatory statements about Plaintiff Patrick Glynn.  While doing so he was acting on behalf of Defendants Facepunch Limited and Facepunch Studios and they are responsible for his acts under *respondeat superior*.  Defendants held Plaintiff out to the public as a programmer who created code for the game, so when it made statements about the programmer of RUST it was known that they were referring to Plaintiff.

325.    On or about December 24, 2014, Defendant Garry Newman published a defamatory statement on the internet in response to a comment posted on the Internet questioning why Garry Newman and Facepunch stopped work on RUST and instead had replaced RUST with the "experimental game."

89

326.    Defendant Newman, stated, "Legacy's code was awful.  It wasn't just shitty code, it was over-engineered.  It's a common thing for the next programmer to mock the previous guy's code – but the previous guy had serious problems, asperger type problems."  The foregoing statement was published on the Internet at:

http://www.reddit.com/r/playrust/comment2/2/qa713/garry_fked_up

http://playrust.com/devblog-40#more-2280

both web addresses are in the public domain.

327.    Defendants' defamatory statement referring to Plaintiff was untrue and made with malice.

328.    The false statement by Garry Newman was made intentionally with malice to purposely do the following:

a.    Cast a false light on Plaintiff Glynn to take away blame for problems with the RUST game created by Newman and others at Facepunch.

b.    Was made as a statement of fact.

c.    Falsely accused Plaintiff of having a mental and/or emotional problem/defect that reflected on his mental agility, critical thinking, and competence.

d.    Made Plaintiff a scapegoat for Facepunchs' waste of the RUST game.

e.    Attributed unfitness or want of integrity in the Plaintiff's performance of his duties of office or employment, or words imputing the lack of an employee's ability to perform his business and profession.

f.    Prevented or attempted to prevent Plaintiff from obtaining employment.

g.     Harmed Plaintiff's reputation including lowering him in the estimation of the community and/or to deterred persons or businesses from associating or dealing with him.

329.   The false statement made by Garry Newman was a public announcement by Facepunch which was accessible by the public.

330.   The foregoing defamatory statement was published by the Defendants with malice with intent to damage Plaintiff and it did damage him.

331.   On or about December 28, 2014, in a publication over the internet on Reddit, Newman made the following statement ascribing Asperger syndrome to Plaintiff.   The statement was:

Legacy's code was awful. It wasn't just shitty code, it was over-engineered. It's a common thing for the next programmer to mock the previous guy's code – but the previous guy had serious problems, asperger type problems.

The statement referred to Plaintiff and people could understand that it referred to him.  This statement was not true.

332.   On or about December 28, 2014, Newman, in a post on DevBlog-40, in reference to the "reboot" Newman linked to his post on Reddit, thereby publishing again his defamatory remarks about Plaintiff, specifically:

Legacy's code was awful. It wasn't just shitty code, it was over-engineered. It's a common thing for the next programmer to mock the previous guy's code – but the previous guy had serious problems, asperger type problems.

The statement referred to Plaintiff and people could understand that it referred to him. This statement was not true.

333.    The slanderous statements described above were intentionally made with malice and purposefully did the following:

a.    Cast a false light on Plaintiff Glynn as the alleged perpetrator of code and other problems with the RUST game;

b.    Were made as a statement of fact;

c.    Falsely accused Plaintiff of lacking ability, knowledge, competence, and skill;

d.    Made Plaintiff a scapegoat for Defendants' poor planning, communication, negligence and waste;

e.    Attributed unfitness or want of integrity in Plaintiff's performance of his duties of office or employment, or words imputing the lack of Plaintiff's ability to perform his business and profession;

f.    Prevented or attempted to prevent Plaintiff from obtaining other employment; and

g.    Harmed Plaintiff's reputation, including lowering him in the estimation of the community and/or deterring persons or businesses from associating or dealing with him.

334.    Defendant intentionally with malice published the foregoing libelous statements with malice, the statements were false, were factual in nature, damaged Plaintiff reputationally and were published to third parties known by Defendants to live in the United States and Minnesota specifically. The effect of the Defendants' libel adversely

affected commerce and harmed Plaintiff within the United States, Defendant intentionally with malice targeted U.S. third parties in Minnesota to see his libelous statements knowing that they would read the aforementioned libelous statements and that Plaintiff would be damaged.

335.    As a result of publishing the statements about Plaintiff on the Internet they have remained accessible to review and constitute a continuing publication of the libelous statements made about Plaintiff which were untrue and were intentionally made with malice.

336.    Further, as a direct and proximate result of these libelous statements, Plaintiff Patrick Glynn suffered injury, lost income, a loss of reputation and standing in his community, and lost employment opportunities.   The statement subjected Plaintiff to disdain by industry peers and Facepunch staff.   It exposed Plaintiff to public hatred or ridicule.   The statements made Plaintiff unemployable because they tarnished his professional reputation.   Defendants' aforementioned wrongful acts caused Plaintiff to suffer mental and emotional distress.

337.    Defendant's foregoing actions are the direct and proximate cause of damage to Plaintiff.   The damages to Plaintiff exceed $75,000.00

### TWENTIETH CLAIM FOR RELIEF
### DISCRIMINATION AGAINST PLAINTIFF IN VIOLATION OF MINN. STAT. §363A.11
### (BY PLAINTIFF GLYNN AGAINST DEFENDANT FACEPUNCH STUDIOS)

338.    The allegations of the previous paragraphs are realleged and incorporated herein by reference in this paragraph as though fully set forth herein.

339.   Minn. Stat. §363A.11 et seq. is a Minnesota law that prohibits an entity that provides public accommodations to the general public from discriminating against those eligible to partake of its services.   Defendant Facepunch Studios, a company that sells computer games over the internet to the public discriminated against Plaintiff by creating a discriminatory and hostile work environment within which Plaintiff was expected to work. Defendant Facepunch Studios transacts business in Minnesota and knew Plaintiff was working with it as an independent contractor in Minnesota at the time it was committing discriminatory acts directed at Plaintiff.   This claim arises under Minnesota state law.

340.   Plaintiff was employed by Defendant Facepunch Studios as an independent contractor creating computer games for public consumption.   He is a United States citizen and suffers from a learning disability and ADHD.   Defendants wrongly accused Plaintiff of having Asperger's.   Further, Plaintiff is married to a woman who is of Hungarian descent.

341.   Plaintiff was discriminated against by Defendants making, condoning, and encouraging discriminatory remarks about his national origin (Americans), disability, black people, Hungarians, about women, feminism, and sex/sexuality.   The discrimination was unwelcome.

342.   Defendants' discrimination against Plaintiff was perpetrated because Plaintiff is a United States citizen, has a known disability (learning disability ADHD) and is married to a woman of Hungarian descent.   Defendants made other discriminatory remarks as well including about people of Hungarian descent.   Plaintiff's wife is of

Hungarian descent.  Some of these marks have been set forth earlier in the facts section of this complaint.[25]

343.   Defendants' discrimination was abusive and damaging to Plaintiff.   The Defendants remarks and acts created a hostile work environment.

344.   Defendants' treated British and Canadian employees differently and more favorably than Plaintiff because of his national origin/heritage.   Defendants created a hostile working environment that discriminated against people based on race, color, national origin, and disability that damaged Plaintiff Glynn.

345.   Defendants wrongfully and discriminatorily terminated Plaintiff's independent contractor relationship.

346.   The discrimination was the direct and proximate cause of the damage to Plaintiff.

347.   Plaintiff was damaged by Defendants' discrimination.

348.   Plaintiff suffered an adverse employment action when his independent contractor relationship was discriminatorily terminated by Defendants.

349.   As a direct and proximate result of Defendants' termination of him, Plaintiff sustained damages in the form of lost income, and lost profits through the present date.  He also suffered future damages in the form of lost income and benefits for subsequent years.

---

[25] See page 42: On 7/31/2013 from Neil Pettitt: "I used to work with a Hungarian and he claimed it was common in hungary to pull the wings off a fly, and whilst in the bath, poke the end of your knob out of the water and let the fly run around it like a little volcanic island, whilst you wanked."

350.    The damages to Plaintiff from the foregoing hostile work environment and related discrimination exceed $75,000.00.

*IN THE ALTERNATIVE*, TWENTY-FIRST CLAIM FOR RELIEF
DISCRIMINATION AGAINST PLAINTIFF IN VIOLATION OF MINN. STAT. §363A.08
(BY PLAINTIFF GLYNN AGAINST DEFENDANT FACEPUNCH STUDIOS)

351.    The allegations of the previous paragraphs are realleged and incorporated herein by reference in this paragraph as though fully set forth herein.

352.    Plaintiff was retained by Defendant Facepunch Studios as an independent contractor with representations including that he would get 60% of the profits of the work he did and that Defendant Facepunch Studios was investing in him.  Plaintiff understood that Defendant Facepunch Studios was going to protect his interest in his creations.  While Plaintiff understood from the representations made by him that he was an independent contractor after he began working for Defendant Facepunch Studios the word bonus was loosely used by it to describe his share of the profits.  Plaintiff was an independent contractor and was treated as such.  Defendant Facepunch Studios did not meet legal requirements for handling Plaintiff as an employee, including but not limited to providing him with W-2 forms, tax withholdings and handling social security matters.

353.    In the alternative, if there should be a determination that the Plaintiff was an employee because of Defendant Facepunch Studios' loose use of the word "bonus," then the Defendants fraudulently mislead him into believing that he was an independent contractor with certain rights and violated Minnesota law by not handling and delivering his bonus in a proper and timely fashion.  Further, if he was an employee rather than an independent contractor, then the Defendant Facepunch Studios discriminated against him

in violation of Minn. Stat. 363A.08 and further violated Minn. Stats. §§181.101, 181.03 and 181.171.

354.    Minn. Stat. §363A.08 et seq. is a Minnesota law that prohibits an employer from discharging an employee based on national origin/heritage and disability, unless doing so is based on a bona fide occupational qualification.  It also prohibits the creation of a hostile work environment based on race, color, national origin/heritage and disability. This claim arises under Minnesota state law.

355.    Plaintiff was hired by Defendant Facepunch Studios as an independent contractor on or about September 28, 2010 and was so employed through the date of his termination.

356.    Plaintiff is a Caucasian United States born citizen.

357.    Plaintiff was well qualified for his position creating computer games.

358.    Plaintiff was the only American that was known to work for Defendant Facepunch Studios and that could be claimed to be an employee.

359.    Plaintiff was discriminated against by his employer based upon his United States national origin/heritage, disability, and his wife's Hungarian national origin.  The discrimination was unwelcome.

360.    Defendant Facepunch Studios' discrimination against Plaintiff occurred when Defendants created a work environment that was hostile to anyone not wanting to be subjected to racist, sexist and other discriminatory remarks based on national origin and disability.  Defendant Facepunch Studios' discrimination was abusive and damaging to Plaintiff.

361.    Defendant Facepunch Studios treated British and Canadian employees differently and more favorably than Plaintiff because of his United States national origin/heritage.  Maurino Berry, received more favorable and better treatment than Plaintiff.

362.    Defendant Facepunch Studios wrongfully terminated Plaintiff.

363.    The discrimination was the direct and proximate cause of the damage to Plaintiff.

364.    Plaintiff was damaged by Defendant Facepunch Studios' discrimination.

365.    Plaintiff was wrongfully fired by Facepunch Studios because of national origin/heritage and/or disability.

366.    Plaintiff's United States national origin/heritage and/or disability were the motivating factors in Defendants' decision to fire Plaintiff.  Defendant Facepunch Studios' conduct as alleged herein constitutes discrimination and the creation of a hostile work environment based on race, color, sex, national origin/heritage and/or disability in violation of Minn. Stat. §363A.08 et seq.

367.    As a direct and proximate result of Defendant Facepunch Studios' discriminatory treatment and termination of him, Plaintiff sustained damages in the form of lost income, and lost profits through the present date.  He also suffered future damages in the form of lost income and benefits for subsequent years.

*IN THE ALTERNATIVE,* TWENTY-SECOND CLAIM FOR RELIEF
WAGE CLAIM UNDER MINN. STAT. §181.101 AND §181.171
(BY PLAINTIFF GLYNN AGAINST DEFENDANT FACEPUNCH STUDIOS)

368.    The allegations of the previous paragraphs are realleged and incorporated in this paragraph by reference as though fully set forth herein.

369.    Plaintiff was retained by Defendant Facepunch Studios as an independent contractor with representations including that he would get 60% of the profits of the work he did and that Defendant Facepunch Studios was investing in him.  Plaintiff understood that Defendant Facepunch Studios was going to protect his interest in his creations.  While Plaintiff understood from the representations made by him that he was an independent contractor after he began working for Defendant Facepunch Studios the word "bonus" was loosely used by it to describe his share of the profits.  Plaintiff was an independent contractor and was treated as such.  Defendant Facepunch Studios did not meet legal requirements for handling Plaintiff as an employee, including but not limited to providing him with W-2 forms, tax withholdings and handling social security matters.

370.    In the alternative, if there should be a determination that the Plaintiff was an employee because of Defendant Facepunch Studios' loose use of the word "bonus," then the Defendant Facepunch Studios fraudulently mislead him into believing that he was an independent contractor with certain rights and violated Minnesota law by not handling and delivering his bonus in a proper and timely fashion.  Further, if he was an employee rather than an independent contractor, then the Defendant Facepunch Studios discriminated against him in violation of Minn. Stats. §§181.101, 181.03 and 181.171.

371.    Defendant Facepunch Studios owes Plaintiff a bonus of 60% profit from RUST and from all derivatives thereof. These bonuses are unpaid despite the fact that Plaintiff has completed all necessary work and the bonuses are due under the compensation plan in effect as to Plaintiff.

372.    Defendant has violated Minn. Stat. §181.101 by failing to pay Plaintiff all wages earned within thirty-one (31) days of the date that the bonuses became due.  The bonuses became part of the wages owed to the Plaintiff when they became due.  More than thirty-one days have elapsed since Plaintiff was terminated.  Defendant Facepunch Studios is in violation of Minn. Stat. §181.101.

373.    As a direct and proximate cause of the breach of Minn. Stat. §181.101, Plaintiff is entitled to recover the full amount of the bonuses and penalties under Minn. Stat. §181.101, plus attorney's fees, cost disbursements and witness fees pursuant to Minn. Stat. §181.171.

374.    Defendant Facepunch Studios has breached its duty to pay bonuses to Plaintiff, which is the actual and proximate cause of damage to Plaintiff in excess of $75,000.00.

IN THE ALTERNATIVE, TWENTY-THIRD CLAIM FOR RELIEF
WAGE CLAIM UNDER MINN. STAT. §181.03 AND §181.171
(BY PLAINTIFF GLYNN AGAINST DEFENDANT FACEPUNCH STUDIOS)

375.    The allegations of the previous paragraphs are realleged and incorporated in this paragraph by reference as though fully set forth herein.

376.    Plaintiff was retained by Defendant Facepunch Studios as an independent contractor with representations including that he would get 60% of the profits of the work he did and that Defendant Facepunch Studios was investing in him.  Plaintiff understood that Defendant Facepunch Studios was going to protect his interest in his creations.  While Plaintiff understood from the representations made by him that he was an independent contractor after he began working for Defendant Facepunch Studios the word "bonus" was

loosely used by it to describe his share of the profits. Plaintiff was an independent contractor and was treated as such. Defendant Facepunch Studios did not meet legal requirements for handling Plaintiff as an employee, including but not limited to providing him with W-2 forms, tax withholdings and handling social security matters.

377.    In the alternative, if there should be a determination that the Plaintiff was an employee because of Defendant Facepunch Studios' loose use of the word "bonus," then the Defendant Facepunch Studios fraudulently mislead him into believing that he was an independent contractor with certain rights and violated Minnesota law by not handling and delivering his bonus in a proper and timely fashion. Further, if he was an employee rather than an independent contractor, then the Defendant Facepunch Studios discriminated against him in violation of Minn. Stat. 363A.08 and Minn. Stats. §§181.101, 181.03 and 181.171.

378.    A "bonus" of 60% of the profits from RUST and all derivatives thereof was part of a contractual compensation plan in effect between Plaintiff and Defendant Facepunch Studios. In the past, there was an established pattern of Facepunch paying Plaintiff a bonus. Defendant Facepunch Studios owes Plaintiff bonuses in the amount of 60% of the profits from RUST and all derivatives thereof. These bonuses are unpaid despite the fact that Plaintiff has completed all necessary work and the bonuses are due under the compensation plan in effect as to Plaintiff. Defendant Facepunch Studios has, contrary to Minn. Stat. §181.03, engaged in unlawful acts with intent to defraud Plaintiff. Facepunch Studios has refused to pay wages amounting to bonus to Plaintiff. Further,

Facepunch has, contrary to Minn. Stat. §181.03, taken wages owed to the employee under a contract of employment.

379.    There was a bonus policy as to Plaintiff in place whereby Plaintiff was to receive 60% of the profits from RUST and all derivatives thereof.  Bonuses due to be paid by Facepunch to Plaintiff remain unpaid.  The employer Facepunch Studios breached the agreement.

380.    Plaintiff has performed all that he was required to do to receive bonuses. Defendant Facepunch Studios has acted in violation of Minn. Stat. §181.03, in not paying bonuses due to Plaintiff.  Plaintiff relied to his detriment upon Defendant Facepunch Studios' promises to pay the bonuses of 60% of the profits from RUST and all derivatives thereof.  Facepunch Studios' non-payment of bonuses has damaged Plaintiff.

381.    Defendant Facepunch Studios owes bonuses to Plaintiff.

382.    More than fifteen days have passed since each of the bonuses were due to be paid to Plaintiff.  Facepunch Studios as an employer is in violation of Minn. Stat. §181.03

383.    Facepunch Studios has altered in the past the way it was supposed to pay bonuses and then further failed to pay the bonuses in violation of Minn. Stat. §181.03.

384.    Defendant Facepunch Studios has deliberately engaged in conduct designed to decrease and damaged the sales of RUST thereby diminishing the 60% of the profits due Plaintiff from RUST.

385.    As a direct and proximate cause of the breach of Minn. Stat. §181.03, Plaintiff is entitled to recover the full amount of the bonuses and penalties under Minn.

Stat. §181.03, plus attorney's fees, cost disbursements and witness fees pursuant to Minn. Stat. §181.171.

386.    Facepunch Studios has breached its duty to pay bonuses to Plaintiff, which is the actual and proximate cause of damage to Plaintiff in excess of $75,000.00.

**WHEREFORE,** Plaintiff prays for judgment in excess of $75,000.00 against Defendants as follows:

a.    Entry of a money judgment for Plaintiff Glynn in excess of $75,000.00 against Defendants Facepunch Studios and Newman jointly and severally for breach of contract.  The judgment should include Plaintiff's damages representing Plaintiff's 60% share of the profits from RUST and any and all games derived from RUST and any and all games created using Plaintiff's code creations.

b.    Entry of a money judgment for Plaintiff Glynn in excess of $75,000.00 against Defendants Facepunch and Newman jointly and severally for breach of implied covenant of good faith and fair dealing.

c.    Entry of a money judgment for Plaintiff Glynn in excess of $75,000.00 against Defendants Facepunch Studios and Newman jointly and severally for intentional infliction of mental and emotional distress on Plaintiff.

d.    Entering a money judgment against Defendants Facepunch Studios and Newman jointly and severally, in an amount in excess of $75,000 as and for negligence.

e.      Entering a money judgment against Defendants Facepunch and Newman,
jointly and severally, in an amount in excess of $75,000 as and for
Defendants' interference with Plaintiffs Bubble Pony and Glynn's
economic advantage and contract.

f.      Entering a money judgment against Defendant Facepunch Studios in an
amount in excess of $75,000 as and for the fraud committed by Facepunch
Studios against Plaintiff Glynn.

g.      Entering a money judgment against Defendant Newman in an amount in
excess of $75,000 as and for the fraud committed by Newman against
Plaintiff Glynn.

h.      Entering a money judgment against Defendants Facepunch Studios in an
amount in excess of $75,000 as and for breach of fiduciary duty owed to
Plaintiff Glynn.

i.      Entering a money judgment against Defendant Newman in an amount in
excess of $75,000 as and for breach of fiduciary duty.

j.      Entering a money judgment against Defendants Facepunch, jointly and
severally, in an amount in excess of $75,000 as and for unjust enrichment
and imposing a constructive trust against Facepunch for the benefit of
Plaintiffs Bubble Pony and Glynn.

k.      Entering a money judgment for Plaintiff Glynn against Defendants
Facepunch jointly and severally, in an amount in excess of $75,000 as and
for fraudulent concealment/omission.

l.      Entering a money judgment for Plaintiff Glynn against Defendant Newman in an amount in excess of $75,000 as and for fraudulent concealment/omission.

m.      Entry of a money judgment for Plaintiff Glynn in excess of $75,000.00 jointly and severally against Defendants Facepunch and Newman and equitably estopping them from further breach of contract and ordering Defendants to pay to Plaintiff his 60% share of the profits from RUST and any and all games derived from RUST and any and all games created using Plaintiff's code creations in perpetuity.

n.      Entry of a money judgment for Plaintiff Glynn in excess of $75,000.00 jointly and severally against Defendants Facepunch Studios and Newman and promissorily estopping them from further breach of contract and ordering Defendants to pay to Plaintiff his 60% share of the profits from RUST and any and all games derived from RUST and any and all games created using Plaintiff's code creations in perpetuity.

o.      For an order of accounting against Defendants Facepunch and Newman for the benefit of Plaintiffs Bubble Pony and Glynn.

p.      For an order of the court defining and establishing Plaintiffs Bubble Pony and Glynn's ownership rights with respect to the game RUST, any and all derivatives thereof and any and all games utilizing Plaintiff's code creations. Preliminarily and permanently enjoining Defendant, its affiliates, and all other persons participating or acting in concert with them, from

infringing any of Plaintiffs rights in the copyrighted work and to

immediately cease all use of the copyrighted work.

q.  Entry of a money judgment for Plaintiffs Bubble Pony and Glynn in excess

of $75,000.00 jointly and severally against Defendants Facepunch and

Newman for committing waste.

r.  Entry of a money judgment for Plaintiff Glynn in excess of $75,000.00

jointly and severally against Defendants Facepunch and Newman for the

misappropriation of Plaintiff's ideas and further ordering Defendants to pay

to Plaintiff his 60% share of the profits from RUST and any and all games

derived from RUST and any and all games created using Plaintiff's code

creations in perpetuity.

s.  Entering a money judgment against Defendants Facepunch and Newman in

an amount in excess of $75,000 as and for defamation of Plaintiff Glynn.

t.  Entering a money judgment for Plaintiff Glynn against Defendant

Facepunch Studios in an amount in excess of $75,000 as and for violation

of Minn. Stat. §363A.11.

u.  *In the alternative*, if Plaintiff Glynn is found to be an employee of

Defendant Facepunch Studios, entering a money judgment for Plaintiff

Glynn against Defendant Facepunch Studios in an amount in excess of

$75,000 as and for violation of Minn. Stat. §363A.08, et seq.

v.  *In the alternative*, if Plaintiff Glynn is found to be an employee of

Defendant Facepunch Studios, entering a money judgment for Plaintiff

106

Glynn against Defendant Facepunch Studios in an amount in excess of $75,000 as and for violation of Minn. Stat. §181.101 and §181.171.

w.   *In the alternative*, if Plaintiff is found to be an employee of Defendant Facepunch Studios entering a money judgment for Plaintiff Glynn against Defendant Facepunch Studios in an amount in excess of $75,000 as and for violation of Minn. Stat. §181.03 and §181.171; and

x.   An award to Plaintiffs Bubble Pony and Glynn of such other and further relief as the court deems just, fair, equitable and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues trial by jury.

Dated: March 12, 2015

**NEFF LAW FIRM, P.A.**
/e/ Fred L. Neff
Fred L. Neff, I.D. #77355
Attorney for Plaintiff
One Corporate Plaza, Ste. 390
7400 Metro Boulevard
Edina, MN  55439
(952) 831-6555
Facsimile: (952) 831-2711

### ACKNOWLEDGMENT

The undersigned hereby acknowledges that pursuant to Fed.R.Civ.P. Rule 11 and Minn. Stat. §549.211, the Court may impose sanctions if it finds a violation of these sections.

Dated: March 12, 2015

/e/ Fred L. Neff
Fred L. Neff, I.D. #77355
Attorney for Plaintiff
Neff Law Firm, P.A.
One Corporate Plaza, Ste. 390

7400 Metro Boulevard
Edina, MN  55439
(952) 831-6555
Facsimile: (952) 831-2711