UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 15-601(DSD/FLN)

Bubble Pony, Inc., a Minnesota
Corporation and Patrick J. Glynn,

        Plaintiffs,

v.                                                      **ORDER**

Facepunch Studios Ltd., Facepunch
Limited, Facepunch Group Limited,
and Garry Newman,

        Defendants,


      Edward E. Wallace, Esq. and Edward E. Wallace Law Offices,
      16133 Ventura Blvd., Penthouse Suite A, Encino, CA 91436 and
      Frederick L. Neff, Esq. and Neff Law Firm, PA, 7400 Metro
      Blvd., Suite 390, Edina, MN 55439, counsel for plaintiffs.

      Todd A. Wind, Esq. and Pamela Abbate-Dattilo, Esq. and
      Fredrikson & Byron, PA, 200 South 6th Street, Suite 4000,
      Minneapolis, MN 55402, counsel for defendants.


This matter is before the court upon the motion to dismiss by defendants Facepunch Studios Ltd., Facepunch Limited, Facepunch Group Limited, and Garry Newman. Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the motion in part.


**BACKGROUND**

This dispute arises from programming work that plaintiff Patrick J. Glynn performed in Minnesota for Facepunch. Facepunch

is an English company and Newman, its majority owner, is an English citizen.  Compl. ¶¶ 12–14, 17.  On September 28, 2010, Glynn sent an email to Newman, offering to perform computer programming services for Facepunch.  Id. ¶¶ 14, 17; Rosenthal Aff. Ex. A.  He highlighted his proficiency in a number of programming languages, extensive experience working on programming projects, and general programming ability.  Compl. ¶ 17; Rosenthal Aff. Ex. A.  Newman responded as follows:

> Adding features, restructuring old features, fixing bugs, making tools etc.[1]  I'm looking for someone that will do this for 8 hours a day without getting bored.  You seem to be that kind of person.
>
> I want to eventually be in a position where you'd be making games for Facepunch Studios, which we'd sell on Steam, or the apple appstore, or whatever, but once that game makes what we've paid you so far back, you'd get something like a 60% cut of all the profits (probably more, that's kind of TBD). So we'd kind of be investing in you, kind of.
>
> Does that sounds like the kind of situation you'd like to be in?

Compl. ¶ 17; Rosenthal Aff. Ex. A.  Glynn replied in the affirmative and stated that his "only concerns" were "making rent, paying bills, and buying groceries."  Rosenthal Aff. Ex. A. Several emails between Newman and Glynn followed, discussing terms

---

[1]     These tasks will be referred to as "programming optimization," which is in contrast to Glynn's work creating games for Facepunch.

of payment.  <u>Id.</u>  Glynn and Newman settled on $1,900 per month, which would be increased by $100 per month until the monthly payments reached $3,000.  <u>Id.</u>  Glynn and Newman did not discuss what compensation Glynn would receive in the event he began creating games for Facepunch.  The parties agree that Glynn was an independent contractor and not a Facepunch employee.

From November 1, 2010, to May 30, 2014, Glynn worked with Facepunch on a number of projects.  Compl. ¶¶ 4, 28.  Initially, Glynn performed programming optimization.  Eventually, however, Glynn began to create games for Facepunch.  Specifically, in mid-2012, Glynn began programming a video game called RUST.  <u>Id.</u> ¶¶ 4, 28, 33, 53.  Glynn produced more than 75% of the source code for the game, and at least a dozen artwork files used in the game.  <u>Id.</u> ¶¶ 31, 35–52.  Facepunch released RUST on a limited basis in June 2013, and made the game available for sale in August 2013.  <u>Id.</u> ¶¶ 33, 53.  Facepunch did not identify Glynn as a creator of RUST.  <u>Id.</u> ¶ 95.  In fact, Glynn alleges that Facepunch concealed his involvement in the game's development.  <u>Id.</u> ¶ 96-97.

To date, RUST has generated at least $46 million in sales.  <u>Id.</u>  After RUST's release, Facepunch paid "bonuses" to Glynn.  <u>Id.</u> ¶ 25.[2]  In October 2013, Facepunch paid Glynn a bonus of

---

[2]  Facepunch encouraged Glynn to set up a corporation to receive the bonuses.  Compl. ¶ 5.  Glynn then incorporated plaintiff Bubble Pony, Inc. in Minnesota for that purpose.  <u>Id.</u>

$19,912.80.  Id. ¶ 63.  In March 2014, Facepunch paid Glynn a bonus of $405,138.24.  Id. ¶ 63.

That same month, Glynn, at Facepunch's request, drafted a document describing how RUST's programming code worked.  Id. ¶ 68. After receiving the document, Facepunch ended its relationship with Glynn, discontinued RUST, and developed a new "experimental game" based on RUST.  See id. ¶¶ 65, 68–72.  In May 2014, Facepunch paid Glynn a final bonus of $277,151.22.  Id. ¶ 64.

Given its popularity, Facepunch received public backlash for abandoning RUST.  Id. ¶ 73.  On December 24, 2014, while addressing questions online regarding RUST's discontinuation, Newman disparages RUST's code and said, "It's a common thing for the next programmer to mock the previous guy's code – but the previous guy had serious problems, asperger type problems."  Id. ¶ 117.[3]

On January 22, 2015, Glynn registered a copyright for RUST as a joint work with Facepunch.  Id. ¶ 59.  The copyright covered the June 2013 limited-release version of the game.  Id.  Glynn has also filed a copyright application for the game's August 2013 version. Id.

---

[3] During his time working on projects for Facepunch, Glynn alleges he was disturbed by other comments like the one above, made by Newman and other individuals working for Facepunch.  Compl. ¶ 98.  He alleges that from January 2013 to May 2014, Newman and others at Facepunch engaged in offensive conversations that were sexist, racist, and included slurs regarding national origin and individuals with disabilities.  Id. ¶¶ 102–110.

4

On March 12, 2015, plaintiff filed the instant suit asserting twenty-three counts, including the following claims against Facepunch and Newman: breach of contract, breach of the implied covenant of good faith and fair dealing, intentional infliction of mental and emotional distress, negligence of officers, supervision, and retention, interference with economic advantage and contract, fraud, breach of fiduciary duty, fraudulent concealment/omission, equitable estoppel, promissory estoppel, accounting, declaratory judgment, waste, misappropriation of ideas, and defamation.  Glynn also alleges the following claims against Facepunch only: unjust enrichment and imposition of a constructive trust, discrimination in violation of Minn. Stat. § 363A.11, discrimination in violation of Minn. Stat. § 363A.08, violations of Minn. Stat. §§ 181.01 and 181.171, and violations of Minn. Stat. §§ 181.03 and 181.171. Defendants now move to dismiss.

## DISCUSSION

## I.    Rule 12(b)(2) Motion

Newman argues that the court lacks personal jurisdiction over him because he has insufficient contacts with Minnesota.  To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must establish a prima facie case that the forum state has personal jurisdiction over the defendant.  Stevens v. Redwing,

5

146 F.3d 538, 543 (8th Cir. 1998).  The court "look[s] at the facts in the light most favorable to the nonmoving party and resolve[s] all factual conflicts in favor of that party."  Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991) (citations omitted).

Glynn argues that the court has personal jurisdiction over Newman under the "effects" test established in Calder v. Jones, 465 U.S. 783 (1984).  Under the "effects" test, a forum has personal jurisdiction over a defendant "where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered — and which the defendant knew was likely to be suffered – [in the forum state]."  Johnson v. Arden, 614 F.3d 785, 796 (8th Cir. 2010) (alteration in original) (citation omitted).

Glynn alleges that Newman induced commercial activity in Minnesota by sending emails to him, a Minnesota resident, and directing him to engage in commercial activity in Minnesota.  Glynn also alleges that Facepunch paid him less than he was owed, which caused harm in Minnesota.  Those facts are sufficient under Calder to establish personal jurisdiction over Newman in Minnesota.

## II.  Rule 12(b)(6) Motion

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).  Although a complaint need not contain detailed factual allegations, it must raise a right to relief above the speculative level.  See Twombly, 550 U.S. at 555.  "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action" are not sufficient to state a claim.  Iqbal, 556 U.S. at 678 (citation and internal quotation marks omitted).

The court does not consider matters outside of the pleadings under Rule 12(b)(6).  Fed. R. Civ. P. 12(d).  The court, however, may consider materials that do not contradict the complaint or are "necessarily embraced by the pleadings."  Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).  Here, the court considers the email exchange between Glynn and Newman.

A.    Contract Claims

Glynn argues that defendants breached their contract and the implied covenant of good faith and fair dealing by failing to pay him 60% of RUST's profits.  Facepunch responds that the parties never agreed to a definite profit-sharing structure.

In Minnesota, the elements of a breach of contract claim are: (1) formation of a contract, (2) performance by the plaintiff of any conditions precedent to the right to demand performance by the defendant, and (3) breach of the contract by the defendant.  Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 833 (Minn. 2011). "Whether a contract is formed is judged by the objective conduct of the parties and not their subjective intent."  Commercial Assocs. Inc. v. Work Connection, Inc., 712 N.W.2d 772, 782 (Minn. Ct. App. 2006).  "An alleged contract which is so vague, indefinite, and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable."  United States v. White, 675 F.3d 1073, 1079 (8th Cir. 2012) (citation omitted).

Here, Facepunch and Glynn appear to have entered into a contract covering Glynn's programming optimization work for Facepunch.  Glynn argues that the contract also entitles him to 60% of RUST's profits.  The parties never agreed to that term, however. When Newman discussed "making games for Facepunch," he used vague and indefinite terms such as "eventually" and "something like 60%."

Rosenthal Aff. Ex. A.  Newman even expressly said that the possibility was "TBD."  Id.  The email exchange simply does not support Glynn's contention that the parties agreed to share RUST's profits.  At most, the emails reflect an intention to explore such an agreement at a later time.  Because the parties never reached such an agreement, there is no contract covering Glynn's work on RUST and his contract claim fails as a matter of law.[4]

### B.  Fiduciary Duty

Glynn next claims that defendants breached their fiduciary duty to him.  Glynn alleges that defendants owed him a fiduciary duty because they contracted to pay Glynn 60% of RUST's profits and were the only ones with control and knowledge of the income and expenses related to RUST.

As already discussed, there was no contract between Glynn and defendants to pay Glynn 60% of RUST's profits.  Even if there were such a contract, formation of a contract is typically insufficient to give rise to a fiduciary duty.  See Northstar Indus., Inc. v.

---

[4]  Without a viable contract claim, Glynn's claim for breach of the implied covenant of good faith and fair dealing also fails. See Cox v. Mortg. Elec. Registration Sys., Inc., 685 F.3d 663, 670 (8th Cir. 2012) ("[A] cause of action for good faith and fair dealing cannot exist independent of the underlying breach of contract claim.").  His claim for interference with contract likewise fails.  See H Enters. Int'l, Inc. v. Gen. Elec. Capital Corp., 833 F. Supp. 1405, 1419 (D. Minn. 1993) (requiring the existence of a contract to form the basis of a claim for interference with contract).

Merrill Lynch & Co., 558 F. Supp. 2d 944, 948 (D. Minn. 2008), rev'd on other grounds, 576 F.3d 827 (8th Cir. 2009) (citing Shema v. Thorpe Bros., 62 N.W.2d 86, 91 (Minn. 1953)) ("[The] arm's length negotiation of a contract does not give rise to a fiduciary relationship."); Carlson v. SALA Architects, Inc., 732 N.W.2d 324, 330-31 (Minn. Ct. App. 2007) (stating that a fiduciary relationship "transcends the ordinary business relationship which, if it involves reliance on a professional, surely involves a certain degree of trust ... and yet is not classified as 'fiduciary'"). Accordingly, dismissal of Glynn's claims for breach of fiduciary duty is warranted.

### C.  Equitable and Fraud Claims

Glynn argues that if there is no contract, he can proceed under the theories of equitable estoppel and promissory estoppel. He also asserts claims of fraud, fraudulent concealment, and fraudulent omission, arguing that Facepunch and Newman defrauded him by promising to share RUST's profits without intending to honor that promise.  All of these claims fail because the alleged promises are vague and indefinite.

"It is fundamental that [equitable] estoppel is based upon a representation of fact and cannot exist as to an expression of opinion as distinguished from a representation of fact." Del Hayes & Sons, Inc. v. Mitchell, 230 N.W.2d 588, 595 (1975).  Discussions

of compensation opportunities that are "open ended" or "without limit" are likewise too vague to support a claim for promissory estoppel.  Martens v. Minnesota Min. & Mfg. Co., 616 N.W.2d 732, 744 (Minn. 2000).  The same is true for fraud claims.  A viable fraud claim requires a material "false representation regarding a past or present fact."  Martens, 616 N.W.2d at 747.  Vague statements do not satisfy the materiality requirement.  Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997).

As already discussed, Newman's statements to Glynn regarding potential future work are vague, tentative, and indefinite, and do not constitute representations of fact.  As a result, dismissal of Glynn's equitable and fraud claims is warranted.

### D.   Employment Claims

Glynn alleges various employment law claims, but now concedes that he was an independent contractor.  Accordingly, all of Glynn's employment claims fail as a matter of law.  See Hanson v. Friends of Minn. Sinfonia, 181 F. Supp. 2d 1003, 1006 (D. Minn. 2002) (stating that claims under Minn. Stat. §§ 363A.08 and 363A.11 must be brought by an employee); Minn. Stat. §§ 181.03, 181.101 (using the terms "employer" and "employee" exclusively).

### E.   Intentional Infliction of Emotional Distress (IIED)

Glynn next alleges that defendants intentionally inflicted emotional distress by engaging in offensive and discriminatory

conversations.  To establish a claim for IIED under Minnesota law, the alleged conduct must cause severe emotional distress.  Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 438–39 (Minn. 1983). Glynn only conclusorily alleges such distress.  See Compl. ¶ 155 (alleging defendants "caused [him] severe mental and emotional distress.").  However, "labels and conclusions or a formulaic recitation of the elements of a cause of action" are insufficient to state a claim.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  As a result, dismissal of the IIED claim is warranted.

**F.   Defamation**

Glynn alleges that Newman defamed him online, thereby harming his business reputation and career prospects.  Glynn specifically points to an internet post in which Newman, allegedly referring to Glynn, described a previous programmer's work as "over-engineered" and indicated that the programmer had "asperger type problems." Compl. ¶ 117.  Newman did not name Glynn in the post or provide further identifying information.

To prove defamation, a plaintiff must show that the defendant made statements that "tend to harm the plaintiff's reputation and to lower him in the estimation of the community." Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980) (citation omitted).  The alleged defamatory statements must "concern[] or

[be] understood to concern the plaintiff." Covey v. Detroit Lakes
Printing Co., 490 N.W.2d 138, 143 (Minn. Ct. App. 1992).  If a
statement does not specifically identify the plaintiff, it is
actionable only if "a reader by fair implication would understand
the statement to be directed at the plaintiff." Glenn v. Daddy
Rocks, Inc., 171 F. Supp. 2d 943, 948 (D. Minn. 2001) (citing
Ruzicka v. Conde Nast Publ'n, Inc. 999 F.2d 1319, 1322 n.6 (8th
Cir. 1993)).

The statement at issue does not meet that standard.  Newman
did not mention Glynn by name.   Nor did he provide other
information that would reasonably lead the reader to identify Glynn
as the programmer,[5] especially given that Facepunch never
identified Glynn as a creator or programmer of RUST.  As a result,
Newman's statements were not obviously directed at Glynn and cannot
form the basis of a defamation claim.  Glynn's defamation claim is
dismissed.

### G.   Negligent Supervision and Retention

Glynn argues that Facepunch did not "take[] reasonable steps
to make sure that its supervisors, managers and employees did not
act improperly or cause damage to the public and other Facepunch
... employees."  Compl. ¶ 162.  He also argues that Facepunch

---

[5] Glynn admits that he was not the only programmer working on
RUST.  Compl. ¶ 31.

negligently retained employees who created a hostile work environment.[6]

In Minnesota, a plaintiff claiming negligent supervision or retention must allege a threat or reasonable apprehension of physical injury. Thompson v. Olsten Kimberly Quality-Care, Inc., 980 F. Supp. 1035, 1041 (D. Minn. 1997); Bruchas v. Preventive Care, Inc., 553 N.W.2d 440, 443 (Minn. Ct. App. 1996). General harassment does not support a claim for negligent retention. See Radcliffe v. Securian Fin. Grp., Inc., 906 F. Supp. 2d 874, 894 (D. Minn. 2012) (collecting cases). Glynn has made no such allegations here and his claims must be dismissed.

**H. Declaratory Judgment**

Glynn alleges that he is a joint owner of the copyright for RUST under the Copyright Act, and seeks a declaratory judgment to that effect. Under the Declaratory Judgment Act, the court may "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a); see also Fed. R. Civ. P. 57. Federal district courts are well-situated to hear disputes where a plaintiff seeks a declaration of copyright ownership pursuant to the Copyright Act. See Four Points Commc'n

---

[6]    Glynn also asserts a claim for negligent training, but Minnesota does not recognize such a cause of action. Halsne v. Avera Health, No. 12-CV-2409, 2013 WL 3088588, at *5 n.1 (D. Minn. June 18, 2013) (citing Johnson v. Peterson, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007)).

Serv., Inc. v. Bohnert, No. 4:13-CV-1003, 2013 WL 4787752, at *4 (E.D. Mo. Sept. 9, 2013).

Section 101 of the Copyright Act defines a "joint work" as a "work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Authors who create a joint work are co-owners of the copyright in that work. Id. § 201(a). Each author has "an independent right to use or license the use of a work, subject to a duty of accounting to the co-owners for any profits." Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1065 n.2 (7th Cir. 1994) (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 121 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5736) (internal quotation marks omitted)). To establish joint ownership in copyright, a plaintiff must show that the parties "intended to be joint authors at the time the work was created." Id. at 1072; see also United States v. Washington Mint, LLC, No. 9901768, 2001 WL 1640073, at *3 (D. Minn. Sept. 5, 2001). The dominant author's intent to share authorship shapes that analysis. Childress v. Taylor, 945 F.2d 500, 508 (2d Cir. 1991). Where parties have meaningfully collaborated on a work, "it is hard to imagine" that such work is "unaccompanied by the requisite intent." Id. at 505. A person does not obtain joint ownership if the parties "expressly agree in a written instrument signed by them that the work shall be

15

considered a work made for hire."   17 U.S.C. § 101.

Facepunch argues that it never intended to enter into joint ownership with Glynn.  Both sides agree, however, that Glynn was an independent contractor for Facepunch and never signed any documents disavowing his copyright interest in any game he produced.   See Compl. ¶¶ 20, 22, 27.   Moreover, Glynn alleges that he wrote approximately 75% of RUST's code, which, if true, would make him RUST's dominant author.  As a result, Glynn has adequately pleaded his claim for declaratory judgment.[7]

**I.   Interference with Economic Advantage**

Glynn argues that Facepunch interfered with his economic advantage by abandoning RUST and replacing it with an experimental game based on his work.  A plaintiff bringing a claim for tortious interference with economic advantage must allege the following five elements: (1) the existence of a reasonable expectation of economic advantage; (2) the defendant's knowledge of that expectation of economic advantage; (3) that the defendant intentionally interfered with the plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; (4) that in the absence of the wrongful act of the defendant, it is

--------

[7]   Because the court concludes that Glynn's copyright claim may proceed, his misappropriation of ideas claim is preempted.  See Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 121 (8th Cir. 1987).

reasonably probable that the plaintiff would have realized an economic advantage or benefit; and (5) that the plaintiff sustained damages.  Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 844 N.W.2d 210, 219 (Minn. 2014).  Glynn has adequately pleaded each of these elements.

Glynn alleges that defendants intentionally denied him compensation for his work on RUST.  Specifically, he alleges that: (1) he performed substantial work as an independent contractor and joint author of RUST, which has generated $46 million in sales, (2) defendants knew of Glynn's proprietary interest in RUST, (3) defendants intentionally interfered with that advantage by discontinuing RUST and developing a sub-standard replacement game using Glynn's work, (4) Glynn should have been paid consistent with his joint ownership of RUST, and (5) he has been substantially undercompensated.  Glynn's allegations are therefore sufficient to set forth a claim for tortious interference with economic advantage.

## J.  Unjust Enrichment, Imposition of a Constructive Trust, and Accounting

Glynn argues that Facepunch was unjustly enriched because it did not share RUST's profits with him.  Glynn demands an accounting from Facepunch to determine RUST's profits, and that such profits should be held in a constructive trust pending the outcome of this

17

case.

"To establish a claim for unjust enrichment under Minnesota law, the plaintiff must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." Schaaf v. Residential Funding Corp., 517 F.3d 544, 553-54 (8th Cir. 2008) (citation and internal quotation marks omitted).   A court may impose a constructive trust relating to a claim of unjust enrichment. Chiu v. Wong, 16 F.3d 306, 309 (8th Cir. 1994); In re Morken, 199 B.R. 940, 964 n.35 (Bankr. D. Minn. 1996).   Moreover, "[i]t is widely recognized that '[a] co-owner of a copyright must account to other co-owners for any profits he earns from the licensing or use of the copyright.'" Goodman v. Lee, 78 F.3d 1007, 1012 (5th Cir. 1996) (quoting Oddo v. Ries, MME, 743 F.2d 630, 633 (9th Cir. 1984); see also Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 223 F.2d 252, 254 (2d Cir. 1955) (stating that "each party is entitled to an accounting from the other" regarding joint works).   The profits of joint works are to be held in constructive trust for the benefit of all joint owners.   Goodman, 78 F.3d at 1012 n.16 (citation omitted).

The court has already determined that Glynn's claim for declaratory judgment, based on joint copyright ownership, survives the motion to dismiss.   Because they are inextricably intertwined

18

with the issue of joint ownership, the court declines to dismiss Glynn's claims for unjust enrichment, imposition of a constructive trust, and accounting at this time.

**K.  Waste**

Finally, Glynn claims he is entitled to relief because Facepunch made harmful changes to RUST, causing material damage to the value of the copyright.  Facepunch argues that the doctrine of waste is limited to real property.  The court agrees.

Minnesota requires that a plaintiff asserting a claim of waste possess land that has been subject to that waste.  See <u>Rudnitski v. Seely</u>, 452 N.W.2d 664, 667 (Minn. 1990) ("An action for waste is based on the premise that a person <u>in possession of land</u> owes another with an interest in the same <u>land</u>.") (emphasis added); <u>see also</u> William F. Patry, 2 Patry on Copyright § 5:10 (noting that waste is a "real property concept inapplicable to copyright").  Glynn's waste claim is based on intellectual, rather than real property, and dismissal of this claim is therefore warranted.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1.  The motion to dismiss for lack of jurisdiction [ECF No. 17] is denied; and

19

    2.    The motion to dismiss [ECF No. 15] is granted in part as set forth above.

Dated:  December 7, 2015

                                        s/David S. Doty
                                        David S. Doty, Judge
                                        United States District Court